**TBG, INC., Plaintiff,**

v.

**Richard A. BENDIS, et al., Defendants.**

**Civ. A. No. 89–2423–EEO.**

United States District Court,
D. Kansas.

Dec. 21, 1993.

See also, 811 F.Supp. 596.

J.D. Lysaught, Mustain, Higgins, Kolich, Lysaught & Tomasic, Chartered, Kansas City, KS, Herbert E. Milstein, Lisa M. Mezzetti, Daniel S. Sommers, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for TBG, Inc.

Bruce Keplinger, John Benge, Michael G. Norris, Michael B. Lowe, Payne & Jones, Chtd., Overland Park, KS, for Richard A. Bendis.

Karen J. Halbrook, John R. Cleary, Husch & Eppenberger, Kansas City, MO, for W. Terrance Schreier.

Anthony F. Rupp, Shughart, Thomson & Kilroy, Overland Park, KS, John M. Kilroy, R. Lawrence Ward, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, Emmett E. Eagan, Jr., Ernst & Young, Cleveland, OH, for Ernst & Whinney.

J.D. Lysaught, Mustain, Higgins, Kolich, Lysaught, Tomasic, Chartered, Kansas City, KS, Herbert E. Milstein, Lisa M. Mezzetti, Daniel S. Sommers, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Martin E. Karlinsky, Scheffler, Karlinsky & Stein, New York City, for Richard S. Masinton, Continental Healthcare Systems, Inc.

J.D. Lysaught, Mustain, Higgins, Kolich, Lysaught & Tomasic, Chartered, Kansas City, KS, M. Michael Gill, Tamara Wilson Setser, Julia A. Riggle, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, MO, Herbert E. Milstein, Lisa M. Mezzetti, Daniel S. Sommers, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Paul R. Billington.

J.D. Lysaught, Mustain, Higgins, Kolich, Lysaught, Tomasic, Chartered, Kansas City, KS, Herbert E. Milstein, Lisa M. Mezzetti, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for George A. Bridgmon.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on numerous motions for summary judgment. The court has considered the voluminous material submitted by all parties and is now prepared to rule. For convenience, the court provides an index of the pending matters.

I. Factual Background ................................................. 1541
  A. TBG's Preacquisition Due Diligence Investigation .................... 1542
    1. TBG's Due Diligence Team ...................................... 1542
    2. Price Waterhouse's "Businessman's Review" ...................... 1542
    3. Recognition of Past Revenue .................................... 1545
    4. Projections for Future Performance ............................. 1546
      a. Sales and Revenue Projections .............................. 1546
      b. Cash Flow Projections ...................................... 1546
    5. The Completion Status of CHSI Products ......................... 1547
    6. Ernst and Whinney's Role ....................................... 1548
      a. Ernst's Knowledge of CHSI Affairs .......................... 1548
      b. Ernst's Audit of CHSI's Financials ......................... 1549
      c. Ernst's Comfort Letter ..................................... 1549
    7. TBG's Knowledge of CHSI's Accounting Methods ................... 1550
    8. TBG's Analysis of CHSI's Market Strength ....................... 1553
    9. TBG's Review of CHSI's Management .............................. 1554
  B. TBG's Motivation to Acquire CHSI ................................ 1555
  C. TBG's Post–Acquisition Investigation ............................ 1557

II. Discussion .................................................................. 1557
   A. Reliance Issues .......................................................... 1558
   B. Causation Issues ........................................................ 1562
   C. Reliance Required on TBG's Claim for Negligence Against Ernst .... 1564
   D. Bendis and Schreier's Stock Purchase Agreements .................. 1565
   E. TBG's Negligent Misrepresentation Claim Against Bendis ........... 1567
   F. Bridgmon's Cross–Claims Against Bendis and Schreier ............. 1569
   G. Masinton's Claim for Contribution Against Bendis ................. 1569
   H. Billington's Claims Against Bendis and Schreier .................... 1569

III. The Choice of Law Issue .......................................... 1572
IV. Motions for Reconsideration ....................................... 1572
V. Conclusion ............................................................... 1572

---

## I. Factual Background

The facts pertinent to the instant motions are as follows. This case arises out of the June 10, 1986, acquisition of Continental Healthcare Systems, Inc. ("CHSI") by plaintiff TBG, Inc. ("TBG"). CHSI was a computer software company specializing in developing and marketing computer-based information systems for hospitals and other health care providers. TBG was one of over forty companies within the Thyssen–Bornemisza Group[1] which employed approximately 13,700 employees worldwide in 1985. TBG's reported assets for fiscal 1985 were approximately $1.15 billion and group sales totalled $1.84 billion.

TBG alleges that defendants Richard A. Bendis (CHSI CEO), Terrance Schreier (CHSI COO), and Ernst and Whinney (CHSI's outside accounting firm) made material misrepresentations and omissions both: 1) during the period when TBG was making inquiries about CHSI from January 1, 1986, to June 10, 1986, the date the acquisition closed; and 2) in public filings by CHSI with the SEC immediately before the purchase (including the fiscal 1985 Form 10–K, the fiscal 1986 first quarter Form 10–Q and related financial statements), the May 20, 1986, proxy statement, and defendant Ernst and Whinney's comfort letter.

TBG alleges misrepresentations and omissions concerning: 1) the status of completion of CHSI products; 2) the prospects for CHSI's future business; 3) the terms of CHSI contracts; 4) the status of purported sales of CHSI products; 5) revenue recognized by CHSI; 6) CHSI's financial statements; and 7) the employment status of certain CHSI officers and employees.

On January 26, 1986, TBG and CHSI reached an agreement in principle for TBG to purchase CHSI at $9.00 per share, subject to the results of TBG's due diligence review. As preconditions to the acquisition, TBG required representations and warranties from CHSI, Bendis, and Schreier concerning: the employment status of CHSI employees, the accuracy of CHSI's financial statements, and the completion status of CHSI products. TBG also required a comfort letter from Ernst and Whinney, CHSI's independent accountant.

TBG was not a novice investor. During the three years surrounding the acquisition of CHSI, TBG completed eight acquisitions (two of which were software companies) and conducted due diligence investigations as a part of several of those acquisitions. TBG began its due diligence investigation of CHSI

---

1. TBG, Inc., a Delaware corporation, is wholly-owned subsidiary of TBG North America Ltd., all of the shares of which are owned by TBG Europe B.V., a Netherlands corporation, which is wholly-owned by N.V. Haic, also a Netherlands corporation. All of the shares of N.V. Haic are owned by TBG Holdings N.V., a Netherlands Antilles corporation, which is owned by Favorita Holding Company Limited, a Bermuda corporation. Favorita Holding Company Limited is wholly-owned by Tamara Corporation, a Liberia corporation. All of the shares of Tamara Corporation are owned by the Thyssen–Bornemisza Continuity Trust, a trust created under the laws of Bermuda.

in January 1986 which continued, at some level, until the deal closed June 10, 1986, at a total cost for the due diligence investigation alone of $445,000.

### A. TBG's Preacquisition Due Diligence Investigation

#### 1. TBG's Due Diligence Team

TBG assembled a due diligence team consisting of over fifteen members of TBG's corporate staff and employees of TBG's subsidiary companies. In addition, TBG employed the following outside consultants to assist in the due diligence review and advise TBG regarding the acquisition: 1) the international accounting firm of Price Waterhouse; 2) the New York law firm of Cravath, Swain, and Moore ("Cravath"); 3) the national marketing consulting firm Boston Consulting Group; and 4) the management consulting firm John Arnold Executrak Systems, Inc. TBG also consulted with Sheldon Dorenfest and Associates, a healthcare software consulting firm.

TBG's due diligence investigation was not designed to detect fraudulent misconduct by the sellers or their agents. Nonetheless, according to TBG's expert Cyril Moscow, an experienced corporate attorney, the due diligence conducted by TBG was "within a customary range of business investigations for businesses of this type."

#### 2. Price Waterhouse's "Businessman's Review"

TBG hired Price Waterhouse to conduct a special "businessman's review" of CHSI in February 1986. The businessman's review was not a full audit, but was intended to provide TBG with an understanding of selected components of the balances on CHSI's October 31, 1985, financial statements, the accounting principles used by CHSI in arriving at those balances, and any significant changes in the management or financial operations of CHSI through January 31, 1986.

As a part of its review, Price Waterhouse sought information about CHSI's financial position and the accuracy of representations by CHSI's management. Price Waterhouse read CHSI's financial statements and Ernst and Whinney's corresponding reports for the fiscal year ending October 31, 1985, and the five preceding fiscal years. TBG did not conduct, or have Price Waterhouse conduct, a complete audit of CHSI's financial statements and thus, TBG maintains, it relied on Ernst and Whinney's audit of CHSI's statements.

Price Waterhouse summarized the findings of the businessman's review in a written report to TBG, dated February 28, 1986. In the report, Price Waterhouse opined that Ernst and Whinney performed "sufficient field work to render an opinion in accordance with generally accepted auditing standards." Price Waterhouse advised TBG that CHSI's revenue recognition policies were very aggressive and reported that CHSI's billing cycle did not coincide with its revenue recognition practices. Price Waterhouse also advised TBG that CHSI's aggressive revenue recognition policies led to significant unbilled receivables at year-end.[2]

As a part of the review, Price Waterhouse representatives interviewed key CHSI management officials, primarily, Richard Bendis (CEO), W. Terrance Schreier (COO), Richard Masinton (CFO), and Paul Billington (Controller) about how CHSI's accounting policies were implemented with respect to specific contracts. Specifically, a representative of Price Waterhouse, Richard Cutler (TBG's Senior Vice President and General Counsel), and Schreier reviewed and discussed CHSI's significant third-party relationships and possible contingent and undisclosed liabilities.

Price Waterhouse and TBG also reviewed all significant accounting principles used by CHSI to determine whether they complied with generally accepted accounting principles ("GAAP") applied on a consistent basis. TBG and Price Waterhouse reviewed CHSI's aggressive revenue recognition practice known as "Plant 7."[3] Price Waterhouse also

---

**2.** Receivables included in the October 31, 1985, financial statements but not yet billed as of December 31, 1985, totalled $9,249,442. Of this amount, $4,275,282 related to contracts such as those with Abbott Laboratories, National Medical Enterprises, and Lee's Summit Hospital.

**3.** "Plant 7" referred to a section of CHSI's offices which were set aside for installation of software and reconfiguration of hardware for customer use. CHSI was recognizing revenue from Plant 7 based on a customer-specific value

reviewed unaudited financial data for the three months ending January 31, 1986, and discussed current financial matters with CHSI management.

Eugene Gaughan and Steve Goodbarn, both of Price Waterhouse, and Ian Robertson of TBG reviewed Ernst and Whinney's workpapers from the 1985 audit of CHSI on a page-by-page basis and met with Jim Olson and Randy Buseman of Ernst and Whinney to discuss CHSI revenue recognition policies. TBG admits that, as part of the businessman's review, Price Waterhouse reviewed all major contracts in force at CHSI (including sales agreements, license and royalty agreements, employment contracts, leases, lines of credit, supplier and customer contracts, union contracts, and government contracts), contracts important to CHSI's sales revenue for fiscal 1985, and contracts entered into during the first quarter of fiscal 1986. In addition, TBG's outside counsel, Cravath, was also responsible for reviewing all contracts identified in the schedules to the Merger Agreement and CHSI's Proxy Statement.

Price Waterhouse's objective was to understand the composition of recorded 1985 revenue and any significant implications CHSI's contracts might have on future revenue. Price Waterhouse's February 28, 1986, report discussed, among others, the following contracts: 1) the joint venture with the 4800 Corporation; 2) the Abbott Laboratories contract; 3) the National Medical Enterprises contract; and 4) the Lee's Summit licensing/sales contract.

TBG, however, maintains that notwithstanding Price Waterhouse's review of all major contracts and the reference to the Lee's Summit transaction in its report, the defendants concealed the existence of the written Lee's Summit demonstration agreement and its negative effect on CHSI revenues. The Lee's Summit transaction apparently involved three original agreements, all executed on July 31, 1985: 1) a computer equipment purchase and installation agreement (Deposition Exhibit 798) for $161,230;

2) a software license agreement (Deposition Exhibit 799) requiring the hospital to pay CHSI $415,000 in monthly installments of $4,940; and 3) a demonstration site agreement (Deposition Exhibit 800) requiring CHSI to pay the hospital $415,000 in monthly installments of $4,940. The software license and demonstration site agreements were amended March 19, 1986, (Deposition Exhibit 819) to reflect installation delays. CHSI reported $570,000 in revenue in the third quarter of 1985 associated with the Lee's Summit contract.

The demonstration site agreement required the hospital to serve as a model hospital to demonstrate CHSI products. CHSI agreed to compensate the hospital for that right. The net effect: $415,000 in CHSI reported revenue from the software licensing agreement was offset by CHSI's liability to the hospital under the demonstration agreement.

According to TBG, Lou Almerini of Price Waterhouse asked Masinton (CHSI CFO) whether a written demonstration agreement existed and Masinton indicated that he was not aware of any such agreement. However, when Masinton later asked Bendis and Schreier whether a written demonstration agreement existed, Bendis gave the written agreement to Masinton. Bendis and Schreier instructed Masinton not to disclose the document to Price Waterhouse or TBG and Masinton followed their instruction. Masinton discussed the written demonstration site agreement with Jim Olson of Ernst & Whinney, but neither Masinton nor Olson revealed the document to Price Waterhouse or TBG.

TBG admits that Richard Cutler (TBG's General Counsel) knew that CHSI had arrangements with various hospitals to serve as demonstration sites for CHSI products. However, TBG maintains that no one at TBG had knowledge of the Lee's Summit written demonstration agreement or of its effect on reported revenues. Further, TBG contends that the demonstration agreement was not adequately disclosed on CHSI's 1985 10–K or the schedules to the Merger Agreement.

being added to the hardware cost, although some CHSI customers had agreed to only a nominal storage charge and others had not acknowledged or agreed to any charge at all. William Marovitz

(CEO and Group Executive of the Medical Information Group of Bibliographical Retrieval Service ("BRS"), a TBG subsidiary) concluded that this source of revenue was "unacceptable."

Defendants argue that TBG was, or should have been aware of the demonstration agreement. As proof, defendants submit: 1) Price Waterhouse's report; 2) the Merger Agreement Schedules; and 3) notations by Lou Almerini of Price Waterhouse on a letter from the CEO of Lee's Summit Hospital to Bendis of CHSI.

First, Price Waterhouse's February 28, 1986, report does not support defendants' position. Although the report noted that Lee's Summit Hospital was to serve as a demonstration and training site, the report made no mention of any payment due to the hospital by CHSI pursuant to a written demonstration agreement. A reasonable inference from the omission of this information is that Price Waterhouse was not aware of the demonstration agreement.

Defendants' argument with regard to Merger Agreement Schedule 3.1(m)(11) is equally unconvincing. Schedule 3.1(m)(11) listed the July 31, 1985, "Computer Systems Demonstration Site Agreement" with Lee's Summit Community Hospital as a marketing agreement. Nicole Bergman of Price Waterhouse stated that she circled the contracts she "need[ed] to see before signing," that she had no reason to doubt that she had reviewed all documents not circled on the schedule, and admitted that the Lee's Summit demonstration agreement was not among those circled on her copy of Schedule 3.1(m)(11). However, the court finds Ms. Bergman's testimony inconclusive to prove that she, in fact, reviewed the demonstration agreement in question; she testified that she had no specific recollection of reviewing the agreement. Although the jury is free to infer from Ms. Bergman's testimony that she did, in fact, review the Lee's Summit demonstration agreement, the court may not do so as a matter of law.

Finally, defendants argue that Almerini reviewed and initialed the Lee's Summit demonstration agreement as a part of his review of CHSI's contracts. Defendants point to Almerini's notes, Deposition Exhibit 1313–A, as proof that Almerini was aware that CHSI had a rental arrangement with the Lee's Summit Hospital. Defendants thus conclude that Almerini had knowledge of the

contents of the demonstration site agreement. However, Deposition Exhibit 1315 was a letter dated January 30, 1986, from the CEO of Lee's Summit Community Hospital to Richard Bendis, discussing a one year sublease of 439 square feet from the hospital at $9.50+ per square foot (a monthly obligation of approximately $348). By contrast, the July 31, 1985, demonstration site agreement (Deposition Exhibit 800), obligated CHSI to pay the hospital $4,940 per month for seven years (a total obligation of $415,000). As a result, even if Almerini reviewed exhibit 1315, nothing about the lease arrangement put Almerini on notice of the provisions in the demonstration agreement. The rental agreement and the demonstration site agreement were apparently two separate and distinct contracts, which imposed different obligations on CHSI.

The court finds that TBG has raised a genuine issue of fact about whether the Lee's Summit demonstration agreement was disclosed prior to the CHSI acquisition. The court cannot determine, as a matter of law, that TBG knew or should have known about the demonstration agreement. Accordingly, summary judgment must be denied.

Notably, TBG knew that the $620,000 from the Lee's Summit contract would not be recognized by TBG in 1985 as revenue. The February 14, 1986, memorandum from Ian Robertson to Jim Castle informed TBG that the Lee's Summit transaction did not qualify as a sale and a $620,000 reduction in 1985 reported revenue would be required under TBG's conservative accounting practices. Robertson did not state his rationale. His memorandum did not mention the demonstration agreement, but did indicate that more information was needed regarding actual delivery dates. We cannot conclude, as defendants urge, that TBG was, as a matter of law, precluded from alleging reliance because TBG restated CHSI's numbers to exclude the Lee's Summit revenue. TBG makes a plausible argument that, although TBG excluded the revenue in fiscal 1985, TBG expected to receive and recognize the revenue at some future time after delivery.

TBG alleges that other material matters were also concealed and/or misrepresented

by CHSI: 1) Schreier's agreement that the East Texas Regional Hospital contract would be a "cashless deal" (meaning no money would change hands); 2) that Netkon and Telekon, the subject programs for several CHSI contracts, were not functional or ready for sale; 3) the financial inability of Physician's Hospital Link ("PHL") to pay under contracts with CHSI totalling $1.4 million; 4) the agreement that Compumed (an entity connected with the Sisters of Charity Hospitals) was not required to pay CHSI on their $1,713,194 sales contract; 5) even if payment were required, Compumed did not have the financial ability to make the payments and the Sisters of Charity Hospitals were not liable on the contract; and 6) CHSI recognized revenue from sales of Pharmakon 2000 in the first quarter of fiscal 1986 when the product was not functional or ready for sale.

Having decided that summary judgment must be denied, the court need not discuss the merits of defendants' motions on each of the above matters. Suffice it to say that the court has reviewed the record at length and, although unable to grant summary judgment, the court has serious questions about the strength of many of TBG's claims in light of evidence that TBG knew about the matters it now alleges were misrepresented. Further, defendants have submitted significant evidence that TBG made a business decision to acquire CHSI over objections of key TBG personnel that $9 per share was too high a price and that the acquisition carried a high level of risk.

### 3. Recognition of Past Revenue

Price Waterhouse and TBG restated CHSI's 1984 and 1985 reported revenues and 1985 and 1986 projected revenues to comply with TBG's more conservative revenue policies. TBG adjusted CHSI's reported revenue downward to reverse the effects of: (1) various contracts TBG would not recognize under its more conservative revenue recognition practices (i.e., nonrecognition of con-

tracts with Abbott Laboratories, National Medical Enterprises, and Lee's Summit Community Hospital); 2) various "unusual" contracts[4] which would not be treated as sales under TBG's policies (fourth quarter 1985 contracts which were not signed until 45 days into the first quarter of 1986); 3) the effect of converting to capitalizing software development costs under FASB 86;[5] and 4) the receivables sold to CIT.

TBG urges that it relied on CHSI's original financial statements as the "starting point" for analyzing and investigating CHSI. TBG insists that it did not restate CHSI's revenue because it questioned the accuracy of CHSI's financial statements or because TBG wished to rely on its own figures rather than CHSI's, but only for purposes of better understanding CHSI's financial picture under TBG's more conservative accounting methods. Despite Irwin Jacobs' statement that "everybody on Castle's staff," i.e., Conover, Marovitz, Schwartz, Farnsworth, Cutler, and Haegele, agreed with Jacobs that CHSI's accounting policies did not comply with GAAP.[6] TBG maintains that at no time prior to acquiring CHSI did Price Waterhouse or anyone with TBG have "any reason to believe" that CHSI's financial statements were not presented in accordance with GAAP. Further, TBG insists that TBG had no indication that Ernst and Whinney's work was not performed in accordance with GAAS or that CHSI's financials were materially false and misleading.

TBG contends that CHSI's *unrestated* revenue figures were presented to TBG's Supervisory Board for use in approving the acquisition. In the Proposal to Acquire dated March 7, 1986, G.H. Thyssen, Chairman of TBG Holding, N.V. and CEO of TBG, stated:

> Due diligence included a detailed study of the company and its markets by S & T management and external consultants and a review of the accounts by TBG's auditors

---

4. For example, CHSI contracts with Abbott Laboratories, National Medical Enterprises, and Lee's Summit were considered unusual contracts.

5. FASB refers to Fair Accounting Standards Board No. 86 which permitted CHSI to capitalize software development costs during fiscal

1985. Price Waterhouse determined that $1.1 million of CHSI's $2.3 million in net income for fiscal 1985 was directly related to early adoption of FASB 86.

6. Jacobs deposition at p. 216–18.

and finance staff. Major findings were that significant downward adjustments to sales and profits resulted from applying TBG's accounting policies.

TBG suggests that Thyssen's comments establish that TBG's purpose in restating CHSI's figures was to apply TBG's accounting policies and not to correct false or misleading information provided by CHSI. Curiously, a November 5, 1986, memorandum from G.H. Thyssen to his father Baron Thyssen–Bornemisza, regarding the CHSI acquisition, stated that as a result of the due diligence process, "TBG did not accept CHSI's accounts, which were restated under TBG accounting principles for Board presentation and future plans." Deposition Exhibit 921.

### 4. Projections for Future Sales, Revenue, and Cash Flow

#### a. Sales and Revenue Projections

CHSI prepared sales and revenue projections for 1986 through 1990. Ernst had no involvement in preparing the CHSI sales and revenue projections; CHSI hired Arthur Anderson to prepare the model for CHSI's financial projections. The TBG due diligence team, Boston Consulting Group, and Price Waterhouse reviewed CHSI's projections to determine whether any adjustments were necessary.

TBG contends that while TBG made suggestions and modifications to CHSI's projections, TBG relied on the underlying data provided by CHSI, including the representations as to the status of completion of Pharmakon 2000. G.H. Thyssen (TBG CEO) testified in his deposition that he believed that CHSI was capable of achieving the restated projections contained in the Proposal to Acquire. Thyssen contends he held this belief notwithstanding the two-page letter from Paul Billington (CHSI's Controller) to Burton Schwartz (CFO of BRS) dated April 23, 1986. The letter informed TBG that CHSI's actual financial results for the first months of fiscal 1986 had fallen short of projected forecasts. Prior to the acquisition, Billington again suggested TBG revise the projections for CHSI to reflect the discrepancies between TBG's projected figures and actual performance for the first seven months of fiscal 1986. However, Schwartz and Farnsworth of TBG did not feel revision was necessary.

#### b. Cash Flow Projections

Price Waterhouse and TBG reviewed CHSI's existing cash flow and cash flow projections for fiscal 1986 through 1990. As a result, TBG knew that CHSI was deferring payment of bills and that CHSI's cash flow was barely adequate. The Proposal to Acquire forecasted a $4.5 million cash shortfall for CHSI for the period from May 1, 1986, through November 30, 1986. Paul Billington (CHSI Controller) estimated CHSI's revised cash flow forecast for the first part of fiscal 1986 had increased by $300,000 to a negative $4.8 million. TBG was aware of this additional cash flow shortfall because TBG monitored CHSI's cash position and maintained regular contact with Billington regarding the cash situation between March 1986 and the June 10, 1986, acquisition. A TBG interoffice memorandum from Jack Haegele to Jim Castle, dated May 13, 1986, recognized a seven-month negative cash flow of between $4.0 and $4.8 million as compared to the $3.3 million shortfall projected in the acquisition proposal.

The bulk of CHSI's revenues were generated by a relatively small number of significant contracts, i.e., Abbott, NME, CIT Corporation, CHMS, Lee's Summit, Medical Center of Tyler, Texas, and 4800 Corporation. Price Waterhouse believed that CHSI's tight cash flow was directly tied to this phenomenon and advised TBG that without the revenue from CHSI's seven key contracts, CHSI would not have shown a gross profit in 1985. In addition, Price Waterhouse advised TBG that CHSI's increasing accounts receivable and aggressive accounting policies were to blame for CHSI's stretched financial position.

Significantly, TBG did not review CHSI's actual financial results for any period after October 31, 1985. TBG did not adjust projections for CHSI's performance in light of CHSI's actual performance for the period from November 1, 1985, through June 10, 1986.

### 5. The Completion Status of CHSI Products

Joseph Paulsen, Vice President of Research and Design for BRS, a TBG subsidiary, conducted a two-day technical review of CHSI software products. Paulsen reviewed CHSI's Pharmakon and Matkon systems and prepared a software evaluation report detailing the scope of his review and summarizing his findings and compiled a list of projected completion dates. Paulsen's report stated, "I made no attempt to evaluate (either within a product or across product lines):—the completeness or adequacy of product function."

Nonetheless, G.H. Thyssen testified that he had been told and believed that TBG had evaluated the completeness and adequacy of the product function of CHSI's software products prior to the acquisition. Thyssen also stated that such an evaluation would have been a very important factor in the acquisition.

Paulsen's evaluation dealt primarily with the technical organization of CHSI's software products, rather than the completeness of product function. Paulsen met with Bendis (CEO), Schreier (COO), Masinton (CFO), and George Bridgmon (CHSI's Vice President of Technical Services) to discuss CHSI software products.

Paulsen and Conover viewed a demonstration on the Pharmakon 2000 system. However, CHSI advised Paulsen that Pharmakon 2000 had not been shipped or installed at an Alpha test site as of January 31, 1986, would not be ready for Alpha testing until June 1986, and would not reach the PC/AT version until November 1986. Paulsen also knew that the Fikon and Surgikon systems would not be in alpha version until July 1986.

TBG argues, however, that Marovitz (President of BRS, a TBG Subsidiary) was told by CHSI employees prior to the CHSI acquisition that Pharmakon 2000 had been designed, delivered, installed, and was actually in operation at a customer's site. Marovitz also contends that Bendis and Schreier repeatedly told him that Pharmakon 2000 had passed quality control and was basically "done." Castle (President of TBG's Systems and Technology Strategic Unit ("STSU"))

was also told by Schreier that Pharmakon 2000 was on schedule and would be delivered in May 1986. According to Marovitz and Castle, TBG relied on the statements of CHSI employees regarding the completion status of the Pharmakon 2000 system.

In addition, George Bridgmon (then CHSI's Vice President of Technical Services) testified that he was instructed by Bendis and Schreier to misrepresent the status of completion of Pharmakon 2000 to TBG, including misleading Paulsen and TBG into believing that the programming on Pharmakon 2000 was basically completed when, according to Kim Wineland (manager of product development for CHSI), CHSI was experiencing serious difficulties with the development of Pharmakon 2000 in the Spring of 1986. TBG's expert Lawrence Pawola opined that, as of July 1986, Pharmakon 2000 had only the most basic capabilities and would satisfy only the least sophisticated hospital pharmacy. The first customer installation of Pharmakon 2000 occurred in the Spring of 1987.

Despite numerous detailed discussions between Marovitz and Bridgmon, Bridgmon did not make any representations to Marovitz regarding the completion status of Pharmakon 2000. Marovitz testified that Bridgmon's silence "made me [Marovitz] feel afraid the product wasn't there." Despite Marovitz's concerns, TBG contends that it did not learn the true status of Pharmakon 2000 until after the deal closed.

TBG admits it knew, prior to the acquisition, that CHSI's announcement of the Pharmakon 2000 system had "cut off" sales of Pharmakon 1000 because customers wanted to wait and purchase the updated version. Thus, timely delivery of Pharmakon 2000 was critical to many CHSI contracts. G.H. Thyssen agreed to the acquisition knowing Pharmakon 1000 was a proven product, but that Pharmakon 2000 was not ready for market.

Price Waterhouse advised TBG that CHSI's Matkon, Fikon, Pharmakon 2000, and Patkon systems were not amortized during fiscal 1985 because the systems were not ready for release to customers by the October 31, 1985, fiscal year-end. Price Waterhouse reported: CHSI's Fikon system was

undergoing Alpha testing; development of the Patkon system had not proceeded as quickly as originally expected; and no installations of Patkon had been made at customer locations as of February 28, 1993.

Price Waterhouse also noted that the three contracts to install Pharmakon and Matkon systems on IBM mainframe computers were at reduced rates because the programs still required further development. In that regard, Paulsen advised TBG that CHSI was trying to work out numerous problems encountered in extending the CHSI products to the IBM mainframe.

Notably, in his October 10, 1986, memorandum to G.H. Thyssen, Ian Robertson stated that TBG lacked the computer proficiency to adequately assess the completeness of CHSI's products, given the specific timings involved. Robertson indicated that the only way TBG could have improved its technical analysis of CHSI would have been to have employed "an outside expert proficient in [the computer] field." Robertson also noted that TBG's analysis was complicated by trying to analyze key CHSI software at the same time that CHSI was developing the software. Robertson stated that CHSI's deadlines appeared to have been met "so that there was no reason to assume, in the face of assurances to the contrary, that the development was not continuing to plan."

### 6. Ernst and Whinney's Role

#### a. Ernst's Knowledge of CHSI Affairs

Defendant Ernst and Whinney ("Ernst"), outside accounting firm for CHSI, audited CHSI's financial statements for fiscal years 1983 through 1985. Ernst & Whinney characterized CHSI as a "high risk" audit client, but believed it had "a good understanding of the Company and the management." In connection with the TBG's acquisition of CHSI, Ernst provided accounting and auditing services to CHSI, discussed CHSI's merger proxy with the SEC, and responded to questions from the SEC regarding CHSI's revenue recognition on computer software sales.

TBG contends that Ernst learned important information concerning allegations of management fraud during its 1984 audit of CHSI's financials. Buseman made the following notation in his 1984 audit workpapers,

> Due to the extent of errors found and our inability to rely on various supporting documentation (such as bills of lading, etc.), inconsistent explanations received from various client personnel (no one knew the whole story), lack of reliance which could be placed on confirmations (indicating no problem when there were, etc.), we expanded our testing and reviews further in order to determine if there were other sales recognition problems.... Based on these additional tests, I discovered three more instances of improper revenue recognition.

Notably, TBG admits it had full access to all of Ernst and Whinney's workpapers which, presumably, included the above statement.

TBG claims that members of Ernst's audit team for CHSI learned that John E. Moenius (then CHSI's CFO and VP of Finance) resigned in 1984, claiming that certain members of CHSI management (namely, Bendis and Schreier) "conspired to withhold information about certain transactions to ensure that revenue from these transactions would be recognized during the fourth quarter of CHSI's fiscal 1984 year." Moenius also identified "other questionable transactions." Although the record is not clear whether Jim Olson (Ernst's partner on the CHSI account) knew about Moenius' allegations, Olson stated the following about Moenius' resignation:

> The Company [CHSI] had been forecasting a very strong third quarter, which was at that time to be used as part of a registration for a stock offering. As a result of John's persistence on these transactions, and our conclusion which came about as a result of our timely review of their quarter operations, the results of the third quarter were actually a loss, and the offer was aborted.

Olson also stated, "I think John Moenius' loss to the Company is significant. I believe he had a clear picture of revenue recognition, and his absence will affect the internal controls of the Company." Paul Schieber, CHSI's Controller in 1984, resigned the week after Moenius and went to work for Ernst and Whinney's Kansas City office. Schieber

discussed the circumstances and allegations surrounding Moenius' resignation with members of Ernst and Whinney's audit team for the CHSI audit.

Ernst also learned during its 1985 audit of CHSI that CHSI had recognized revenue on sales of the Pharmakon 2000 product. Ernst advised CHSI that Pharmakon 2000 revenue could not be recognized because the product was not complete.

Ernst reviewed the Lee's Summit transaction in connection with services performed in March 1986, shortly before CHSI's 1986 form 10–Q for the first quarter of 1986 was filed. In addition, Masinton consulted Olson about the demonstration agreement and its impact on revenues. TBG, therefore, contends that Ernst knew CHSI had outstanding liability related to the demonstration agreement and should have insured the agreement was disclosed to TBG prior to issuing the comfort letter.

In addition, when Masinton refused to sign off on CHSI's fiscal 1986 first quarter Form 10–Q unless CHSI addressed his concerns about the appropriateness of recognizing revenue on certain incomplete products, CHSI called in Randy Buseman of Ernst and Whinney to review the transactions in question. Significant issues regarding the completion status of key CHSI products, i.e., Pharmakon 2000, Telekon, Netkon, and Pharmanet, came to Buseman's attention.

Buseman prepared a memorandum summarizing his review and analysis of questionable items. Buseman noted, "[t]he Company's main concern with revenue recognition on this contract seems to be the status of Pharmakon 2000 development—i.e. is the product substantially complete at 1/31/86 so that revenue recognition is in accordance with the Company's policy." The memorandum discussed issues regarding revenue recognition on CHSI sales contracts during the first quarter of 1986, including, in detail, the Lee's Summit Demonstration Agreement.

Buseman's "second" memorandum was identical, but contained the following notation at the end, "I understand that the particulars of significance of these transactions have been or will be communicated by CHS to all parties of interest, including TBG. We give no opinion as to the revenue recognition afforded any of the above transactions." Ernst did not disclose either version of Buseman's memoranda to TBG or Price Waterhouse.

### b. Ernst's Audit of CHSI's Financials

Ernst issued an audit opinion on January 23, 1986, certifying that CHSI's financials had been prepared according to GAAP and audited according to GAAS. The audit opinion which was appended to CHSI's 1985 form 10–K stated,

> [i]n our opinion, the financial statements referred to above present fairly the financial position of Continental Healthcare Systems, Inc. at October 31, 1985 and 1984, and the results of its operations and changes in its financial position for each of the three years in the period ended October 31, 1985, in conformity with generally accepted accounting principles consistently applied during the period, . . . .

Price Waterhouse's February 28, 1986, report pointed out to TBG that audited financials for CHSI were not available for the first quarter of fiscal 1986. Despite knowing that audited financials would not be available, TBG proceeded with the CHSI acquisition.

### c. Ernst's Comfort Letter

On May 20, 1986, despite the above information, Ernst prepared and delivered an accountant's "comfort" letter to TBG. The comfort letter stated:

> We have examined the balance sheets of Continental Healthcare Systems, Inc. (the "Company") as of October 31, 1985 and 1984 and the related statements of income, stockholders' equity, and changes in financial position for each of the three years in the period ended October 31, 1985, included in the Proxy Statements dated May 20, 1986; our report (which contain [sic] qualifications as set forth therein) with respect thereto is also included in the Proxy Statement. . . .

> In our opinion, the financial statements examined by us and included in the Proxy Statement comply in form in all material respects with applicable accounting requirements of the Act and the related published rules and regulations.

We have not examined any financial statements of the Company [CHSI] as of any date or for any period subsequent to October 31, 1985; the purpose (and therefore the scope) of the examination was to enable us to express our opinion on the financial statements as of October 31, 1985, and for the year then ended, but not on the financial statements for any interim period within that year. Therefore, we are unable to and do not express any opinion on the unaudited condensed balance sheet as of January 31, 1986 and unaudited condensed statements of income and changes in financial position for the three-month periods ended January 31, 1986 and 1985, included in the Proxy Statement, or on the financial position, results of operation, or changes in financial position as of any date or for any period subsequent to October 31, 1985.

Prior to issuing the comfort letter, Ernst: 1) read the minutes of the CHSI Board of Directors meetings for the period from February 1, 1986, to May 16, 1986 (but not any minutes for meetings from May 17, 1986, through May 20, 1986); 2) read the unaudited condensed balance sheet as of January 31, 1986, and the unaudited condensed statements of income and changes in financial position for the three-month ending January 31, 1986 and 1985; and 3) made inquiries of certain CHSI officials responsible for financial and accounting matters. Regarding those procedures, the comfort letter (with emphasis added) stated,

The foregoing procedures do not constitute an examination made in accordance with generally accepted auditing standards. Also, they would not necessarily reveal matters of significance with respect to the comments in the following paragraph. Accordingly, we make no representations regarding the sufficiency of the foregoing procedures for your purposes.
**Nothing came to our attention as a result of the foregoing procedures,** however, that caused us to believe that:

(i) The unaudited condensed financial statements ..., included in the Proxy Statement, do not comply in form in all material respects with the applicable accounting requirements of the Act and the published rules and regulations thereunder; or

(ii) those unaudited condensed financial statements are not in conformity with generally accepted accounting principles applied on a basis substantially consistent with that of the audited financial statements....

Our examination of the financial statements for the periods referred to in the introductory paragraph of this letter comprised [sic] audit tests and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole. For none of the periods referred to in the preceding sentence nor any other period did we perform audit tests for the purpose of expressing an opinion on individual balances of accounts or summaries of selected transactions such as those enumerated below and, accordingly, we express no opinion thereon....

It should be understood that ... [our] procedures would not necessarily reveal any material misstatement of the amounts or percentages listed above. Further, we have addressed ourselves solely to the foregoing data as set forth in the Proxy Statement and make no representation as to the adequacy of disclosure or as to whether any material facts have been omitted.

### 7. TBG's Knowledge of CHSI's Accounting Methods

TBG knew that CHSI's revenue recognition policy permitted software revenue to be recognized upon receipt of a letter of intent to purchase if a signed contract or purchase order was received within 45 days of the close of the quarter. TBG also knew that 80% of CHSI's software revenue was recognized upon execution of the letter of intent, with the remaining 20% of revenue recognized upon installation of the software. This practice of recognizing revenue on the "substantial completeness" of CHSI's software was evident in Ernst and Whinney's 1985 audit workpapers, which were made available

to and examined by TBG during the preacquisition investigation.

TBG officials admit they were aware that CHSI's revenue recognition policies were "very aggressive" prior to acquiring CHSI:

*Georg Heinrich Thyssen–Bornemisza* (Chairman of TBG's Management Board) knew, after he received the due diligence reports from representatives of TBG and TBG's consultants in the due diligence investigation, that TBG might have been overpaying by as much as $15 million dollars (almost one-half of the total $31.6 million purchase price) for CHSI's assets.

*Manfred Kimmle* (President of the Board of Management of TBG Holdings) testified that CHSI's revenue recognition policies were very aggressive. Kimmle also advised G.H. Thyssen in January 1986 that CHSI's financials were inflated (particularly with regard to revenues).

Kimmle expressed his position against the CHSI acquisition at the TBG Board of Management meeting on July 3, 1986, as follows:

> "Company has limited substance, no track: new management, product licensed in, product development success unclear";
>
> CHSI was a "cash trap";
>
> the "1986 outlook [was] more than doubtful";
>
> CHSI's "longer-term outlook [was] questionable";
>
> CHSI was "set-up for sale";
>
> "Conclusion: vote against the deal. At minimum, protect TBG through price: Max. $20 mln upfront, rest contingent payment ... kill deal on terms."

*Ian Robertson* (Vice President of Internal Audit for TBG) described CHSI's accounting policies as "on the borderline of being generally accepted." Robertson advised Jack Haegele (Senior Vice President of Finance for TBG) that CHSI's revenues might be inflated because of a CHSI policy to recognize revenue if a purchase order came within 45 days.

*Eugene Gaughan* (Partner with Price Waterhouse) concluded that CHSI's revenue recognition policy was "far at the liberal side of the bell-shaped curve" of acceptable GAAP. TBG was so advised at a due diligence meeting on February 7, 1986.

*Lou Almerini* (of Price Waterhouse) noted at the February 7, 1986, due diligence meeting, "Accounting policies. Liberal. Way toward the left under the bell-shaped curve of acceptable GAAP—hopefully under the curve, but we're not sure." He also noted at a presentation by Boston Consulting that CHSI was "fairly high risk acquisition;" "not as stable/reliable as CLSI;" "uncertain market potential;" "not a well established player in many markets."

*Irwin Jacobs* (Vice President of Operations for the TBG STSU) advised TBG staff members that CHSI's revenue recognition policy was "off the page" and was not even under the bell-shaped curve of acceptable GAAP.

*Burton Schwartz* (Vice President of Finance for BRS) concluded that CHSI chose "a very aggressive position for recognizing revenues." Burton stated, "[i]t is no question that it is their intention to hype 1986 earnings to make the company's financial results appear stronger." Schwartz advised Castle that TBG was paying too much for CHSI.

*Irwin Jacobs* (Vice President of Operations for TBG's STSU) believed that "$40 million was too much to pay for a company that was projecting $17 million in sales."

In addition, TBG admits that TBG officials knew that Ernst and Whinney believed that CHSI's revenue recognition policies were very aggressive.

TBG memoranda also reveal some of the information TBG officers and staff knew about CHSI prior to the acquisition.

> On a January 17, 1986, memorandum from Richard Cutler (TBG General Counsel) and William Bultman (TBG due diligence team member) to Manfred Kimmle (President of TBG Holdings), Kimmle made a handwritten note to G.H. Thyssen dated January 20, 1986 stating, "financials, revenue recognition, could be very inflated. Haegele/Auditors will have to thoroughly audit financials and reassess price."

In a January 21, 1986, memorandum to Cutler, Kimmle stated that he was concerned that CHSI may have been using very liberal-aggressive accounting in recognizing revenues and profits and, hence, TBG could have been offering much higher multiples (e.g., price/earnings ratio) than met the eye.

During the February 7, 1986 due diligence meeting, Boston Consulting advised Castle, Roepers, Conover, and Cutler that CHSI was a high risk acquisition because it was a relatively small company in a dynamic market where environmental trends were threatening its business.

The February 28, 1986, Price Waterhouse report concluded:

> Many of the company's products had only recently been developed and have indeterminate market potential. Further, the Company's market—the health care industry—was undergoing regulatory and environmental changes whose effects on the future marketability of CHSI's products are indeterminable. These factors suggest a very high degree of product and market risk.

Kimmle's March 5, 1986, memorandum to Bultman discusses alternatives in structuring the CHSI deal so as to minimize TBG's up-front risk. Bultman stated, "based on the information I have received so far, the deal has unacceptably high risk if it involves some $30 million cash up-front with minimal contingent payments."

In his March 6, 1986, memorandum to Kimmle, Jack Haegele (Senior Vice President of Finance for TBG) concluded that TBG was "paying a premium for a company, with both significant market and legal risks—a company without a proven product or a management track record. I would not recommend doing this acquisition, it is too high a risk for the amount of money."

A March 10, 1986, memorandum from Bultman to Kimmle stated, "in my view the $9.00 per share price is seriously in excess of what the actual financial value of the company is at this time.... Hence, a cash purchase at $9.00 per share places all the business risk on TBG in addition to probably paying too much for the company."

During the March 12, 1986 Pre–Board Management meeting, TBG's corporate staff advised G.H. Thyssen that the acquisition of CHSI was too risky and too expensive. Thyssen recognized that the staff who opposed the acquisition would agree to the purchase at $10 to $15 million less than the originally agreed price. Nevertheless, Thyssen intended to recommend the acquisition to the Board because of the company's fit into the overall strategy of Castle's STSU. Thyssen stated that the $10 to $15 million premium would be considered a corporate risk.

An October 10, 1986, memorandum to G.H. Thyssen from Ian Robertson explaining why the due diligence procedures failed to disclose the differences in goodwill and opening equity for CHSI, stated,

> [i]t was stated and accepted that there was a high degree of risk in the acquisition, and that the forecast growth was extremely aggressive and that the price was high. Due diligence had disclosed that controls were poor and that the various legal agreements left much to be desired but there was nothing to suggest that there might be any form of deception, only a general feeling of discomfort at the corporate staff level. It was, therefore, a business decision to go ahead with the acquisition.

Paul Billington (CHSI Controller) calculated the adjustments to CHSI's balance sheet necessary for revenue recognition under TBG's more conservative policy. Throughout the acquisition process, Billington discussed the effect of these "blackhole" revenue adjustments [7] to CHSI's opening balance sheet with Burton Schwartz (Vice President for a TBG subsidiary). Schwartz was aware of the CHSI contracts recorded in the first quarter of 1986 that would not meet TBG's revenue recognition criteria. In February 1986, Billington proposed adjustments to re-

---

7. Blackhole adjustments refer to writing down CHSI's assets and increasing goodwill in order to restate CHSI's financials in terms of TBG's accounting policies.

duce CHSI's accounts receivable by $1,671,-000 and discussed these adjustments with Schwartz. As the amount of the necessary adjustments grew, Billington kept Schwartz apprised of the increasing adjustment amount. As the "Adjustments to the Opening Balance Sheet" section of TBG's Proposal to Acquire CHSI reflects, TBG contemplated these adjustments in deciding to acquire CHSI:

> CHSI's current policy is to recognize most revenue on contract signing (about 80%) with the remainder upon installation. If acquired by TBG, CHSI will operate under a more conservative revenue recognition policy, booking systems sales upon shipment of both hardware and software. This change will result in a one-time charge to accounts receivable of $5 million, reflecting booked orders by CHSI that TBG would not have recognized. Accompanying this change is an increase in inventory of $1.6 million for hardware previously booked but not yet shipped. In addition, an increase of $2.1 million in Deferred Installations is required to reflect an increase in contracts received, but not yet recognized.

### 8. CHSI's Market Strength

Boston Consulting Group ("BCG"), a marketing consulting firm, assisted TBG in reviewing the hospital automation market and the growth potential of CHSI in that market. BCG investigated and analyzed the revenue forecasts and market share for CHSI's two key software products—Pharmakon and Matkon. A key CHSI product, Pharmakon 2000, accounted for 45% ($10.4 million) of projected 1986 sales and 42% ($12.7 million) of projected 1987 sales. TBG considered the Pharmakon 2000 product to be CHSI's most important product. BCG also briefly investigated the market prospects for some other CHSI software products, Surgikon, Fikon, and Patkon.

BCG conferred with industry experts and members of CHSI's management and conducted interviews with representatives from both large and small hospitals, some of which were CHSI customers. Members of TBG's corporate staff also interviewed several CHSI customers during January and February of 1986 and consulted the healthcare software consulting firm of Sheldon Dorenfest and Associates for background information about CHSI's market situation.

BCG audited CHSI's sales for 1985 and the first quarter 1986 and CHSI's backlog list of pending sales. BCG advised TBG that there was only a 35%–40% chance that CHSI would achieve its financial projections. William Bultman (a member of TBG's due diligence team) stated in a memorandum to James Castle (head of TBG's due diligence team), "the volume of 1986 sales that have been booked [by CHSI] but not yet executed is critical towards understanding TBG's 1986 risk—management should have these numbers."

BCG raised two "red flags" in the CHSI acquisition. First, CHSI did not have an overall system for large hospitals (the single/multi-vendor issue). Second, BCG was disappointed by the small number of potential sales and customers interested in buying a CHSI product.[8] BCG advised Castle that there was "cause for concern" about whether CHSI would meet its projections for fiscal 1986 and 1987. Castle responded that the results of the backlog audit "didn't worry him." Castle told BCG, "you've done enough."

TBG also conducted its own extensive review of CHSI's existing backlogs and orders in order to substantiate the financial projections for CHSI. Irwin Jacobs (Vice President of Operations for the TBG STSU)[9] reviewed CHSI's backlog. Jacobs reviewed CHSI's sales projections for the third and fourth quarters of 1986 on a line-item by line-item basis with Don Trammel (CHSI's Vice President of Sales and Marketing) and Richard Masinton (CHSI's CFO) to determine the probability that CHSI's orders would actually close.

---

8. Boston Consulting found that the majority of CHSI's customer prospects indicated either a very low probability or a zero probability of ever purchasing a CHSI product.

9. TBG asserts that Jacobs was not a CPA and did not have expertise or background in the financial or accounting aspects of TBG's review.

CHSI gave Jacobs a listing of "booked" sales, i.e., signed contracts with no contingencies. That list included: 1) a $537,000 sale to Healthcare International, Inc.; 2) a $1.6 million sale to Sisters of Charity (Compumed); and 3) a $1.4 million sale to Physician's Hospital Link. Jacobs included all three contracts in his presentation to TBG's Supervisory Board on March 14, 1986.

### 9. TBG's Review of CHSI Management

Retaining the existing management team to operate CHSI was very important to TBG. TBG was a corporation with numerous subsidiaries and it did not have experienced staff managers available to step in and operate newly-acquired companies. According to G.H. Thyssen, this was especially true with regard to the CHSI acquisition because TBG was entering a new area and was counting on substantial growth from CHSI. In sum, TBG expected CHSI's existing management to remain and run CHSI after TBG acquired the company. Accordingly, TBG argues, the cohesiveness, honesty, and integrity of CHSI's management team were important factors in TBG's acquisition decision.

The management consulting firm of John Arnold Executrak Systems, Inc. ("Executrak") was hired to: 1) demonstrate TBG's commitment to make the merger work; 2) begin "smoking out" issues that could interfere with a successful merger; and 3) provide an independent assessment of CHSI's management and their ability to work as a team.

Various members of CHSI management met periodically, both before and after the closing, with representatives of Executrak in confidential interviews to discuss the merger and the impact of the merger on CHSI management.[10] Executrak concluded, "the [management] group is strong as a team.... [S]olid teamwork has been established.... Individuals might be replaceable, but the group's effective team-work and dynamism would not be easily duplicated."

Boston Consulting also evaluated CHSI in terms of its management and concluded that CHSI's strength was "more in its manage-

ment—and less in its market position." Boston Consulting's support for the acquisition was based, in large part, upon its conclusions about the quality of CHSI's management.

TBG believed that Masinton was CHSI's Vice President of Finance and CFO. TBG found Masinton to be competent in that role. TBG also believed that Billington was CHSI's Controller and was favorably impressed with Billington's competence and abilities as Controller. Price Waterhouse concluded that Masinton and Billington were "key financial" officers and "key management" for CHSI.

Bendis and Schreier made positive oral comments about the integrity of CHSI management and denied that they had any knowledge that any employee was unhappy or disgruntled or intended to leave CHSI. Moreover, Bendis and Schreier expressly represented to TBG that Masinton and Billington would continue their employment as financial officers after the acquisition in the following affirmation: "To the best of the Company's knowledge, no executive employee has any plans to terminate his employment with the Company or such Subsidiary as a result of the Merger or otherwise."

The Merger Proxy also represented that Masinton was CFO and Vice President of Finance: "All of the executive officers of Continental will remain in its employ after the Merger." Schreier, as CHSI Secretary, signed a Certificate of Incumbency dated June 10, 1986, which certified, "the persons named below have been duly elected, have been duly qualified and are now officers of said corporation holding the respective offices listed beneath their names...." Richard S. Masinton was listed as Vice President—Finance, Treasurer, and Chief Financial Officer. Curiously, although both he and TBG claim that Masinton was not Vice President of Finance for CHSI on June 10, 1986, Masinton's signature appears beside this designation on the Certificate of Incumbency.

TBG maintains that Masinton was not Vice President of Finance, CFO, or Treasurer, but was Vice President of Product Develop-

---

**10.** Bendis and other CHSI top officers circulated internal memoranda alerting CHSI personnel of potential questions and issues that could be raised in their interviews with Executrak representatives.

ment as of April 1986. Masinton stated that he changed positions to disassociate himself with CHSI's finance department because of his concerns about the accuracy of CHSI's reported revenues and whether CHSI provided materially misleading projections to TBG. Masinton's change of position was reflected on a CHSI confidential internal organization chart, which was not revealed to TBG prior to the acquisition.

Masinton and Billington met with Bendis and Schreier on May 30, 1986, to express their concerns about CHSI financial matters. Masinton and Billington informed Bendis and Schreier that Masinton's exposure to CHSI products in his capacity as Vice President of Product Development had led him to the conclusion that certain products were not substantially complete. In light of that conclusion, Masinton believed that the Form 10–Q for the first quarter of 1986 and the financial projections supplied to TBG by CHSI were materially misleading.

Before leaving the May 30, 1986, meeting, both Masinton and Billington either resigned or indicated an intention to resign. Masinton subsequently delivered a letter of resignation to Bendis and received a severance letter from Bendis dated June 13, 1986 (three days after the closing of the acquisition). Apparently, Billington did not resign at that time. In a letter to Billington dated July 17, 1986, Bendis, for CHSI, agreed to indemnify and hold Billington harmless for any misstatements contained in CHSI's financial statements and projections in which Billington participated.

TBG did not learn of Masinton's true position or that Masinton and Billington had threatened to resign until after the acquisition closed, when Jay Newcom (CHSI's corporate counsel) contacted Cutler (TBG General Counsel) and informed Cutler that Masinton and Billington had threatened to resign from CHSI prior to the acquisition and that Masinton had raised questions regarding CHSI's financial statements.

In addition, Schreier was aware that F. Donald Trammell (CHSI's Vice President of Sales and Marketing) planned to resign immediately after the closing of the acquisition. However, Schreier did not inform TBG of Trammell's intentions.

TBG also contends that Bendis misrepresented Moenius' true reason for resigning from CHSI in that Bendis stated that Moenius was not able to take the pressure, when, in fact, Moenius resigned because of serious concerns about CHSI's accounting and revenue recognition practices. Moenius allegedly believed that key CHSI management officials had conspired to withhold financial information in an effort to favorably impact CHSI's fiscal 1984 financial picture.

### B. TBG's Motivation to Acquire CHSI

CHSI officers began exploring merger/acquisition prospects in 1984. TBG was first approached about purchasing CHSI by Shearson–Lehman, CHSI's agent, in June of 1985. TBG decided not to pursue acquisition at that time. However, in December 1985, TBG's Systems and Technologies Strategic Unit ("STSU") decided to establish a presence in the hospital information area and Alex Roepers, TBG's Director of Acquisitions, contacted Shearson–Lehman regarding CHSI.

TBG agreed in principle to pay $9.00 per share—a total purchase price of approximately $31 million—for CHSI, a company with reported revenues in fiscal 1985 of only $14.2 million. Although TBG later restated revenues down to $9.3 million in accordance with its more conservative revenue recognition principles, TBG did not attempt to negotiate a lower purchase price and ultimately acquired CHSI at the original $9.00 per share price. TBG insists it was only interested in acquiring companies with at least a 20% per year growth rate and would not have paid $9.00 per share, $31.6 million, for CHSI unless TBG believed that CHSI was capable of growing at the 20% rate. TBG forecast CHSI sales at $23.1 million for fiscal 1986 and $31 million for fiscal 1987. TBG's Proposal to Acquire, presented to TBG's Supervisory Board for consideration of the CHSI acquisition, projected $55.7 million in sales in fiscal 1990 [11] and forecast CHSI to be worth $102.2 million by the end of fiscal 1990.

---

11. TBG's projected sales required a four-fold increase in CHSI's reported sales increase over

Boston Consulting Group advised TBG to proceed, despite concerns about "parts of the revenue forecast," because CHSI had "strategic value as a 'keystone' for TBG's medical group, and because of the quality of management." Joseph Paulsen's software evaluation report indicated that there were "excellent potential synergies [between CHSI and TBG] ... in terms of sharing software products." The Proposal to Acquire noted that CHSI was "an excellent fit with the strategic model of TBG's Systems & Technologies Sector. The company would become the principle automation business in the Medical Information and Automation Systems core business of the S & T sector."

TBG's officers and staff made the following statements, among others, regarding the CHSI acquisition..

*Georg Heinrich Thyssen–Bornemisza* (Chairman of TBG's .Management Board) stated:

> [T]he price that was being proposed was a fair and reasonable price for the stock of Continental, subject to achieving the projections.... [W]hen you look at the purchase of a company such as Continental that had projected high growth, you pay on projections, you don't pay on existence.

A March 7, 1986, memorandum from G.H. Thyssen stated, "the Strategic Unit wished to acquire the company for strategic reasons. From a corporate viewpoint there is a concern about the level of risk."

*Baron Hans Heinrich Thyssen–Bornemisza* (Chairman of TBG's Supervisory Board) knew that the CHSI acquisition

> had some risks, of course, but we [TBG] wanted to increase in this software business. They [software companies] were, in those days, very expensive to get into. So the other Supervisory Board members thought it was a high price, but it is [sic] a price one had to pay for this kind of field.

*Richard Cutler* (General Counsel for TBG) believed that CHSI was not worth $9 a share unless CHSI was going to grow.

*James Castle* (President of TBG's STSU and head of TBG's due diligence investigation) stated, "most, if not all of the value of Continental was based on future expectations of Continental." Castle also stated that TBG bought CHSI "for strategic reasons" and "based on a business plan jointly put together with Continental Healthcare" which included CHSI's projected future earnings.

*William Bultman* (Vice President of Corporate Development for TBG) stated that TBG was under financial pressure in purchasing CHSI because "so much of [CHSI's] value was in the future." Bultman calculated the price/earnings multiple to be in excess of 300 times earnings and stated, "the $9.00 per share price is seriously in excess of what the actual financial value of the company is at this time."

*Burton Schwartz* (Vice President of Finance for BRS) believed that the $9 per share price for CHSI was too high because TBG was "paying on everything for the future." Schwartz questioned the feasibility of CHSI's growth at the projected rate.

*Alex Roepers* (Director of Acquisitions for TBG) stated that TBG's decision to acquire CHSI was based on projections, not historical financial information. TBG was "buying the future or buying significant sales growth with significant [operating] margins. We are not buying the balance sheet."

The minutes of TBG's Supervisory Board March 15, 1986, meeting reveal that the purpose of the CHSI acquisition was "to develop medical information and automation systems as a core business of the [STSU] unit [of TBG]; CHSI is identified as the best available entry vehicle, with good strategic fit." The minutes recorded approval of the acquisition by TBG's CEO and Chairman of the Board: "The Chief Executive [G.H. Thyssen] said that he was finally convinced by the strongly positive attitude of unit management, and believed that the acquisition of CHSI would be the best available way to

five years. Under TBG's lower restated revenue figures, the $55.7 in projected sales required a

six-fold sales increase.

develop the approved strategy. The Chairman [Baron Hans Heinrich Thyssen–Bornemisza] concurred."

## C. TBG's Post–Acquisition Investigation

According to TBG, it began to learn facts after the closing on June 10, 1986, which led TBG to believe that it had been defrauded in connection with the CHSI acquisition. TBG initiated an investigation into whether it had been misled with regard to the status of completion of CHSI software products, the propriety of revenue recognition in connection with certain transactions, and the employment status of key CHSI management officials. TBG fired Bendis and Schreier in late September of 1986 based on the preliminary results from the investigation. Irwin Jacobs assumed the position of interim Chief Executive Officer and concluded that many of CHSI's products were undeveloped "vaporware" and others were far less developed than had been represented to TBG prior to the acquisition.

TBG draws a distinction between knowing that CHSI used very aggressive accounting methods and knowing about misrepresentations and/or fraud. TBG stresses that it would not have completed the acquisition if it had known the information concealed by defendants or the truth about the alleged misrepresentations. G.H. Thyssen stated in his deposition, "if we were more honestly told about the status of the company at the time or had known more facts at the time which management knew, it was very clear that we wouldn't have gone forward with the acquisition." Thyssen also stated he would have terminated the acquisition if he had known that Masinton and Billington had threatened to resign in May of 1986.

TBG filed the instant suit June 8, 1988. TBG seeks damages from all three defendants for primary and aider-and-abettor liability for section 10(b) and Rule 10b–5 violations, and for common law negligence, negli-

gent misrepresentation, and fraud. TBG asserts additional claims against Bendis and Schreier for controlling person liability under section 20, breach of contract,[12] and indemnity. Fingerpointing is abundant in this case and numerous counter, cross, third and fourth party claims have been made. Each of these claims will be discussed in turn below. Although various portions of the parties' briefs have discussed whether Kansas or New York law applies in this case, we do not reach the choice of law issue in deciding the instant motions.

## II. Discussion

The elements of a section 10(b) action for primary liability are: 1) a *misrepresentation Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1516 (10th Cir.1983), *or omission Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); 2) of material fact TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); 3) *made with scienter Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); 4) *on which the plaintiff relied Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989–90, 99 L.Ed.2d 194 (1988); 5) *that proximately caused plaintiff's injury Manufacturers Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13, 20–21 (2d Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). For cases listing the elements, see *Grubb v. FDIC,* 868 F.2d 1151, 1162 (10th Cir.1989), and *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981).

Aider-and-abettor liability requires: 1) a primary violation of the securities laws by another; 2) knowledge of the primary violation by the aider-and-abettor; and 3) substantial assistance by the aider-and-abettor in the achievement of the primary violation. *DBLKM, Inc. v. RTC,* 969 F.2d 905, 908 (10th Cir.1992); *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir. 1992).

---

12. As a part of the merger, Bendis and Schreier, as shareholders of significant amounts of CHSI stock, executed stock purchase agreements with TBG. These stock purchase agreements provided for contingency payments and indemnification by TBG and contained representations, warranties, agreements and covenants by Bendis and Schreier. The applicable provisions from the agreements will be discussed below.

Defendants have filed motions for summary judgment alleging lack of reliance and/or causation. Reliance and causation are related, although distinct, concepts. *Huddleston,* 640 F.2d at 547. Reliance refers to proof that the plaintiff acted in reliance on the alleged misrepresentation or failure to disclose in the face of a duty to disclose, while causation requires a causal link between the alleged misrepresentation or omission and the plaintiff's loss. *Id.* Defendants seek summary judgment contending TBG cannot show justifiable reliance or establish causation with regard to the CHSI acquisition because TBG had full knowledge of the alleged misrepresentations/omissions.

"Summary judgment is appropriate 'if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Eastman Kodak Co. v. Westway Motor Freight, Inc.,* 949 F.2d 317, 319 (10th Cir.1991) (quoting Fed.R.Civ.P. 56(c)). The evidence is to be viewed in the light most favorable to the party opposing summary judgment. *World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). Summary judgment may not be granted if the trier of fact reasonably could return a verdict for the nonmoving party. *DBLKM, Inc. v. RTC,* 969 F.2d 905, 908 (10th Cir. 1992). Ever mindful of these standards for summary judgment, we now turn to the defendants' motions.

## A. Reliance Issues

Although reliance is an essential element of a primary violation under section 10b and Rule 10b–5, *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989–90, 99 L.Ed.2d 194 (1988); *Grubb v. FDIC,* 868 F.2d 1151 (10th Cir.1989), a plaintiff in an omissions case is entitled to a presumption of reliance if the alleged omissions were material. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Holdsworth v. Strong,* 545 F.2d 687, 695 (10th Cir.1976), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). TBG argues that the same principle applies in the instant case because TBG's claims sound primarily as omissions rather than as misrepresentations. *See Cameron v. E.M. Adams & Co.,* 547 F.2d 473, 477 (9th Cir.1976). Thus, TBG contends, reliance should be presumed because defendants do not challenge the materiality of the alleged omissions.

We need not resolve the question of whether the instant case involves primarily omissions or misrepresentations because factual issues preclude summary judgment on the issue of reliance.[13] Assuming, without deciding, that reliance is a required element and that TBG has established reliance, TBG still must show that such reliance was justified. *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511 (10th Cir.1983) (requiring justifiable reliance in a 10b–5 claim); *Holdsworth,* 545 F.2d at 696–97 (requiring proof of justifiable reliance).

Justifiable reliance must be evaluated in light of all the elements of the transaction. *Id.* The relevant factors are: 1) the plaintiff's sophistication and expertise in fi-

---

13. Although not now deciding this issue and without exploring the applicable law in the Tenth Circuit, the court notes the well-reasoned opinions of the courts in *Frankel v. Wyllie & Thornhill, Inc.,* 537 F.Supp. 730, 739 (W.D.Va.1982) (no "principled basis on which to determine whether the mix of allegations . . . [were] 'primarily' of misrepresentations or omissions . . . they are . . . [l]ike standing dominoes . . . one misrepresentation . . . caus[ing] subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements"); *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 188 (3d Cir.1981) ("[S]trict application of the omissions-misrepresentations dichotomy would require the trial judge to instruct the jury to presume reliance with regard to the omitted facts, and not to presume reliance with regard to the misrepresented facts." While appealing in theory, this approach has little practical applicability in a jury trial.); and *Gruber v. Price Waterhouse,* 776 F.Supp. 1044, 1050–51 (E.D.Pa.1991) (Inaccuracies in financial statements are generally misrepresentations rather than omissions: "A financial statement is supposed to be an accurate portrayal of a company's financial situation. . . . missing financial information makes the portrayal inaccurate . . . [and] misrepresents the company's true financial situation."). See also *Grossman v. Waste Management, Inc.,* 589 F.Supp. 395 (N.D.Ill.1984).

nancial and securities matters; 2) whether a long-standing business or personal relationship of some sort existed between the plaintiff and the defendant; 3) the parties' access to relevant information; 4) the existence of a fiduciary relationship between the plaintiff and the defendant or other key person; 5) concealment of the fraud; 6) plaintiff's opportunity to detect the fraud; 7) which party, if any, initiated or sought to expedite the transaction; and 8) the specificity of the misrepresentations. *Zobrist,* 708 F.2d at 1516 (citations omitted). "No single factor is determinative; the relevant factors must be considered and balanced to determine whether reliance was justified." *Id.* (citations omitted). "Justifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm." *Id.*

■ Under the test set forth in *Zobrist,* TBG's reliance was not justified if:

[TBG] intentionally close[d] [its] eyes and refuse[d] to investigate, concerning the circumstances, in disregard of a risk known to [TBG], or so obvious that [TBG] must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

*Id.* at 1517. "Only when the plaintiff's conduct rises to a level of culpable conduct comparable to that of the defendant's will reliance be unjustifiable." *Id.* at 1516 (citing *Holdsworth,* 545 F.2d at 693). "Such conduct must amount to at least reckless behavior." *Id.; see also Hackbart v. Holmes,* 675 F.2d 1114, 1117 (10th Cir.1982).

In *Zobrist,* the plaintiff failed to read the private placement memorandum provided to him by the defendants. The court charged the plaintiff with constructive knowledge of the contents of the memorandum. *Id.* at 1518. Balancing the relevant factors, the court held that the plaintiff did not justifiably

rely on misrepresentations which were directly contrary to the warnings in the placement memorandum. *Id.* at 1518–19.

By contrast, TBG conducted an extensive preacquisition due diligence investigation of CHSI in an attempt to fully explore all aspects of CHSI. TBG contends that, far from closing its eyes to known or obvious potential risks or refusing to investigate some aspect of CHSI prior to the acquisition, TBG sought to discover all available information. TBG urges that the alleged misrepresentations were caused by defendants' nondisclosure and were, thus, not discoverable by TBG during the preacquisition investigation. TBG argues that nothing about its preacquisition investigation or its decision to acquire CHSI was reckless.

TBG urges that the preacquisition investigation of CHSI, no matter how thorough, did not preclude justifiable reliance. TBG insists that it reasonably and justifiably relied on the information provided by CHSI as the starting point for its preacquisition investigation. TBG admits that many members of TBG management believed, prior to acquisition, that the CHSI acquisition was risky. However, TBG insists that TBG officers contemplated only the normal level of acquisition risk present in any acquisition, and not extraordinary risk commensurate with fraud by the defendants.

Defendants, relying on the *Zobrist* factors and *Atari Corp. v. Ernst & Whinney,* 981 F.2d 1025, 1030 (9th Cir.1992),[14] maintain that reliance on alleged misrepresentations was not justifiable or reasonable because TBG acquired complete knowledge about CHSI via TBG's preacquisition investigation. Further, defendants contend that TBG knowingly chose to take the risk of acquiring CHSI despite a prevalent belief among TBG management that $9 per share was far in excess of a fair price for CHSI. *See Zobrist,* 708 F.2d at 1517 ("a plaintiff may not reasonably or justifiably rely on a misrepresentation where its falsity is palpable") (citing

---

**14.** In *Atari,* the plaintiff proceeded with an acquisition on a "daredevil bet" despite "mounting evidence that [the acquired company's] financial statements were grossly inaccurate, [and] reflect[ed] a ridiculous overvaluation of the company's assets." *Atari,* 981 F.2d at 1030. While

somewhat similar to *Atari,* the instant case is distinguishable. Although defendants have submitted significant evidence that TBG knew about many of the matters of which TBG now complains, the evidence in the instant case falls short of the egregious circumstances present in *Atari.*

*Holdsworth v. Strong,* 545 F.2d 687, 694 (10th Cir.1976), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977)).

Under *Zobrist,* a sophisticated investor is less likely to have justifiably relied on alleged misrepresentations than a nonsophisticated investor. TBG admits that it was a sophisticated investor as compared to many other investors, although alludes to a potential fact question about whether TBG was a sophisticated investor in healthcare computer software companies. This factor weighs in favor of defendants. TBG was an extremely sophisticated business conglomerate which regularly executed business acquisitions and had recent experience in computer software company acquisitions, albeit possibly not healthcare software.

CHSI and TBG did not have a long-standing business or personal relationship upon which TBG relied. This *Zobrist* factor weighs against justifiable reliance by TBG.

With regard to access to relevant information (the third *Zobrist* factor), the parties agree that TBG had unrestricted access to CHSI during the due diligence investigation. Nonetheless, the evidence submitted by TBG shows that Bendis and Schreier, as inside directors and key officers of CHSI, had superior access to the truth of information allegedly misrepresented, especially concerning CHSI's management.

Access to relevant information by Ernst was more limited. Ernst gave TBG all workpapers used during Ernst's audits of CHSI. However, Buseman's March 15, 1986, memorandum, which discussed various questionable CHSI transactions, was apparently not among workpapers reviewed by TBG. Notably, Buseman's memorandum was written well after Ernst's 1985 audit, but before Ernst's comfort letter to TBG of May 20, 1986.

When factual allegations are considered in the light most favorable to TBG, Ernst and Whinney (as CHSI's long-time auditor) knew, or had access to knowledge, that:

1) CHSI had attempted to recognize revenue on incomplete products in 1985;

2) was a "risky" audit client;

3) CHSI had a written on-site demonstration agreement with Lee's Summit Hospital that had not been revealed by Masinton in response to an inquiry by Lou Almerini of Price Waterhouse;

4) Buseman noted questions and concerns about CHSI in his March 15, 1986, memorandum and indicated, "these transactions have been or will be communicated by CHS to all parties of interest, including TBG";

5) Ernst did not disclose the information in Buseman's second memorandum to TBG or determine if anyone at CHSI had disclosed it;

6) John Moenius' resignation in late 1984 was related to concerns about revenue recognition and serious accusations regarding Bendis and Schreier.

By contrast, TBG knew or had access to knowledge that:

1) CHSI's revenue recognition and accounting practices were extremely aggressive and possibly even outside the parameters of GAAP;

2) CHSI had on-site demonstration agreements with hospitals (although TBG contends that it did not know about the Lee's Summit demonstration agreement or its impact on reported revenues);

3) Price Waterhouse opined that CHSI was a risky acquisition;

4) there was cause for concern about whether CHSI could meet the projections for 1986 and 1987;

5) CHSI's performance had fallen short of projections for the first seven months of fiscal 1986 (although TBG did not quantify the shortfall);

6) CHSI's cash flow was barely adequate and projected cash flow shortfall was $300,000 greater than expected for the first part of fiscal 1986;

7) TBG knew that Pharmakon 1000 was a proven product, but Pharmakon 2000 was not yet complete or proven. Marovitz became concerned about the completion status of the Pharmakon 2000 product when George Bridgmon was silent on the issue;

8) CHSI was trying to work out numerous problems encountered in extending CHSI products to the IBM mainframe;

9) significant "blackhole" adjustments would be required to CHSI's opening balance;

10) many TBG officials believed that the CHSI acquisition was too risky and that the $9.00 per share price was "seriously in excess" of CHSI's actual financial value.

In support of their reliance argument, defendants rely on *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir.1984). There, the Second Circuit upheld the granting of summary judgment in favor of the defendant based on the absence of justifiable reliance. *Grumman* was notably similar to the instant case in numerous respects: the plaintiff was a world-renowned Fortune 500 company; the transaction at issue was a large ($55 million) corporate acquisition; Grumman was represented, at all stages of the acquisition, by a sophisticated group of counsel, executives, and engineers; Grumman enjoyed unrestricted access to all the facilities, personnel, and records of the acquired company; Grumman proceeded with the acquisition knowing a core product of the acquired company was only in the testing stages and without conducting independent tests or reviewing the results of tests performed by the company. The *Grumman* court held that the plaintiff's reliance on an alleged misrepresentation regarding product status was not justifiable "given [the plaintiff's] extensive inquiries and investigation." *Id.* at 738. "[A]ccess bars claims of reliance on misrepresentations." *Id.* at 737 (citations omitted).

However, *Grumman* is distinguishable from the instant case in two key respects. First, the plaintiff in *Grumman* disclaimed reliance on all "statements, warranties, representations, or information, verbal or written" other than those set forth in the parties' agreement. *Id.* at 732. Second, at least with regard to the alleged misrepresentations about the status of CHSI's management and the Lee's Summit transaction, factual disputes exist here about whether TBG had access to the allegedly misrepresented information.

Ernst makes a convincing argument that TBG had superior access to the truth of the alleged misrepresentations because of TBG's extensive preacquisition investigation. Nonetheless, Ernst's knowledge of the Lee's Summit demonstration agreement and other matters in Buseman's memorandum force the court to conclude that Ernst had access to material information which was both unknown and unavailable to TBG. Accordingly, this factor weighs in favor of justifiable reliance by TBG.

TBG concedes that there was no "traditional" fiduciary relationship between TBG and the defendants. Yet, TBG suggests that the Supreme Court in *S.E.C. v. Capital Gains Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), made defendants responsible to provide and disclose full, accurate, and truthful information to TBG. Even so, TBG cites no authority for its proposition that this obligation equates with a "fiduciary relationship" under *Zobrist*. We find TBG's argument unpersuasive. The fiduciary relationship factor weighs against justifiable reliance by TBG.

Clearly, TBG prevails on the concealment of the fraud factor with regard to Bendis and Schreier. TBG has offered substantial evidence (recited earlier in this opinion) of actions by Bendis and Schreier to conceal the true employment status of CHSI's management and the Lee's Summit demonstration site agreement.

The record is less clear with regard to whether Ernst and Whinney acted to conceal the alleged fraud. Price Waterhouse and TBG had complete access to Ernst's audit workpapers. However, TBG alleges that Ernst concealed material facts which would have at least raised questions about CHSI. Specifically, Ernst knew that: its auditors questioned whether they could rely on explanations from CHSI personnel, CHSI was a high risk audit client, John Moenius resigned under questionable circumstances, and the Lee's Summit demonstration site agreement had not been revealed to Price Waterhouse by Masinton. While failure to disclose this information does not necessarily equate with concealment of fraud by CHSI, under TBG's

version of the facts, this factor weighs in favor of TBG.

TBG contends it had no opportunity to detect the fraud by CHSI because the true information was concealed by defendants and no amount of reasonable investigation could have revealed the truth. TBG's point has particular relevance to Bendis and Schreier. The record is replete with evidence that Bendis and Schreier orchestrated material omissions and made affirmative misrepresentations regarding material facts about CHSI.

The record also could support the conclusion by the finder of fact that Ernst and Whinney's opportunity to detect CHSI's alleged fraud, although less than that of Bendis and Schreier, was superior to that of TBG. Disclosure of, or further inquiry into, the matters contained in Buseman's memorandum would likely have revealed the alleged omissions and misrepresentations to TBG. This factor weighs slightly in favor of TBG as against Ernst.

The final factor, the specific or general nature of the alleged misrepresentations, is not helpful in this case because the alleged misrepresentations and omissions were fairly general. This factor does not weigh strongly either for or against justifiable reliance by TBG.

In conclusion, although defendant Ernst presents strong arguments against justifiable reliance by TBG with regard to misrepresentations in CHSI's financial statements, disputed questions of fact surrounding Buseman's memorandum and the Lee's Summit demonstration agreement prevent the court from finding, as a matter of law, that TBG's reliance, at least with regard to those two issues, was not justifiable. Despite substantial evidence that TBG knew the truth about some of the matters it now alleges were misrepresented, under TBG's version of the facts, we cannot say that the falsity of the alleged misrepresentations was palpable, or that TBG deliberately closed its eyes to an obvious risk.

Furthermore, under the facts as submitted by TBG, Bendis and Schreier clearly are not entitled to summary judgment on the issue of reliance. Significantly, Bendis and Schreier

have failed to explain or controvert TBG's justifiable reliance on alleged misrepresentations about CHSI's management, except to argue that misrepresentations about management are not relevant because TBG bought CHSI for its strategic fit, not for its management. To the contrary, TBG has submitted a wealth of evidence that the strength of CHSI's management was a very important component of the acquisition decision.

On the question of alleged misrepresentations about the status of product development, the court has carefully considered all of the evidence presented by all three defendants that no information about product status was concealed or misrepresented to TBG and that TBG knew, or should have known, the true completion status of CHSI's products. While the court is impressed by the strength of defendants' evidence on this issue, out of an abundance of caution and because of the overlapping nature of the various issues raised, defendants' motions for summary judgment, based on lack of justifiable reliance, will be denied on all issues.

Similarly, summary judgment on TBG's claims for common law fraud must be denied because genuine issues of fact remain on the issue of justifiable reliance, an essential element of common law fraud under the law of both Kansas and New York. *See Whitten v. Farmland Indus.*, 759 F.Supp. 1522, 1542 (D.Kan.1991); *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Maryland,* 715 F.Supp. 578, 585 (S.D.N.Y.1989).

## B. Causation Issues

Ernst also challenges TBG's claims on the issue of causation and Bendis has adopted Ernst's arguments on this issue. First, defendants claim that TBG failed to allege causation in the complaint or the pretrial order. The court finds this argument without merit. Moreover, even if TBG's allegations were deficient, the court would permit TBG to amend; defendants can hardly claim surprise or prejudice with regard to TBG's theory of causation.

Causation in securities law claims has two components: transaction (but/for) causation and loss (proximate) causation. To pre-

vail, plaintiff must establish both types of causation. *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir.1989); *Ames v. Uranus, Inc.,* # 92–2170–JWL, 1993 W.L. 106896 at *6 (D.Kan. March 17, 1993); *Seiffer v. Topsy's Intern., Inc.,* 487 F.Supp. 653, 665–66 (D.Kan.1980). Defendants essentially concede that TBG has submitted evidence to establish transaction causation. However, they argue that TBG has not alleged or offered evidence of loss causation.

■ To show loss causation, TBG "must set forth how 'the misrepresentation touches upon the reasons for the investment's decline in value.'" *Ames v. Uranus, Inc.,* # 92–2170–JWL, 1993 W.L. 106896 at *6 (D.Kan. March 17, 1993) (quoting *McGonigle v. Combs,* 968 F.2d 810, 821 (9th Cir.1992), *cert. dismissed sub nom., Casares v. Spendthrift Farm, Inc.,* —— U.S. ——, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992)); *see also Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981). Loss causation may also be shown where the alleged damages were "a reasonably foreseeable result of the misleading statement." *McGonigle,* 968 F.2d at 821, n. 12.

The loss causation requirement serves as a limiting device in securities claims. The rationale behind requiring loss causation is that a defendant should only be held liable for the foreseeable consequences of the defendant's actions. *Huddleston,* 640 F.2d at 549 (citing *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 718 (2d Cir.1980) (Meskill, J., dissenting) ("Where the purchase of stock is induced through a misrepresentation, one is chargeable only for the consequences flowing from that statement; one does not thereby become an insurer of the investment, responsible for an indefinite period of time for any and all manner of unforeseen difficulties.")). "Absent the requirement of causation, Rule 10b–5 would become an insurance plan for the cost of every security purchased in reliance upon a material misrepresentation or omission." *Id.* (citations omitted).

To illustrate, the court in *Huddleston* offered the following example of loss causation: an investor who purchased stock in a single vessel shipping venture in reliance on a misrepresentation regarding the vessel's capaci-ty, but with full disclosure that the vessel would not be insured, would be unable to establish loss causation if the vessel later sunk as the result of a casualty. *Huddleston,* 640 F.2d at 549 n. 25.

This example also illustrates the distinction between reliance and causation. The investor purchased the stock in *reliance* on the misrepresented capacity of the vessel. However, an action under section 10(b) would fail—the investor would be unable to establish loss causation because destruction of the uninsured vessel (and not inadequate cargo capacity) *caused* the investor's loss.

■ Defendants argue that because TBG knew all material information about CHSI, TBG cannot establish loss causation. Specifically, defendants urge that TBG cannot show that the alleged misrepresentations/omissions touched upon the reasons for CHSI's decline in value or that TBG's alleged loss was the reasonably foreseeable result of the misrepresentations.

Defendants attack the opinion of TBG's expert, Joseph Marren, as insufficient evidence to establish loss causation. Marren stated, "[i]f TBG proceeded [with the acquisition] with full knowledge of the facts, then … there were no damages in the case." Defendants, urging that TBG had full knowledge of all material facts about CHSI, conclude that Marren's opinion does not establish loss causation. Defendants contend that Marren's opinion shows that TBG's damages were not proximately caused by the alleged misrepresentations because TBG's knowledge of the truth was a superseding event. The problem with this argument is that it presumes TBG had full knowledge of all material facts with respect to CHSI.

We have already held that, despite strong evidence that TBG had full knowledge of the accounting matters allegedly misrepresented, the court cannot determine the extent of TBG's knowledge as a matter of law. At least with regard to Ernst's liability, genuine issues of fact regarding TBG's knowledge of the Lee's Summit contract and Buseman's memorandum preclude summary judgment on the issue of causation. Similarly, genuine factual questions on many issues require the

court to deny Bendis' motion for summary judgment on the issue of causation.

Defendants also take issue with TBG's causation theory, urging that TBG's causation evidence establishes only transaction causation, but not loss causation. They contend that TBG has only alleged that it would not have acquired CHSI if it had known the truth about the alleged misrepresentations (transaction causation). Defendants rely heavily on *McGonigle*. There, the court rejected plaintiffs' causation theory that defendants' misrepresentations about the "quality" of the investment induced them to purchase the stock which then declined in value. The court stated, "[plaintiff's theory] renders the concept of loss causation meaningless by collapsing it into transaction causation."

Defendants complain that TBG has only alleged transaction causation in that TBG contends it would not have purchased CHSI *but for* defendants' alleged misrepresentations. TBG argues that loss causation is also present because defendants' misrepresentations/omissions caused TBG to overvalue CHSI and induced TBG to acquire CHSI at an inflated price. TBG states that it does not seek damages for losses caused by a decline in the value of CHSI's stock after acquisition. Rather, TBG argues, the defendants' alleged misrepresentations/omissions caused TBG to pay too much for CHSI initially and its damages are the amount of that overpayment.[15]

However, TBG's present position is contrary to the damages alleged in the Pretrial Order filed June 16, 1993. In the pretrial order, TBG requested out-of-pocket damages of $45,174,000: TBG's initial cash investment in CHSI of $30,545,000 plus $1,004,000 in transaction costs and $13,625,000 in loans

and cash advances to CHSI through November 1986. Notably, TBG does not state CHSI's true value or the amount of TBG's overpayment.

To the extent that TBG seeks to recover for the amount it overpaid, we cannot grant summary judgment as a matter of law. Out of an abundance of caution, defendants' motions for summary judgment based on an absence of causation will be denied at this time. TBG is forewarned, however, that loss causation must be established at trial for *all* of TBG's claimed damages. Further, with regard to Ernst, absent loss causation evidence on the other alleged misrepresentations by Ernst, TBG's recovery may well be limited to the damages proximately caused by nondisclosure of the Lee's Summit demonstration agreement and Buseman's memorandum.

## C. Reliance Required on TBG's Claim for Negligence Against Ernst

Ernst and Whinney also seeks summary judgment on TBG's negligence claim (Count VII) on the ground that TBG was not Ernst's client and, therefore, cannot maintain an action for professional negligence against Ernst. Ernst's main concern is that TBG not be allowed to circumvent the justifiable reliance requirement by characterizing its claim as one for negligence, rather than negligent misrepresentation. Ernst argues that TBG should be limited to an action for negligent misrepresentation and that the negligence claim should be eliminated to prevent duplicitous recovery and jury confusion.

Regardless of whether TBG was Ernst's client, under either New York or Kansas law,[16] TBG must show that Ernst knew TBG

---

**15.** TBG also seeks to recover money loaned to CHSI by TBG after the acquisition to keep CHSI operating.

**16.** In *Security Pacific Business Credit v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992) (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985)), the court permitted recovery for a negligence claim by a third party who relied on the accountant's work. The court required the plaintiff to show, in addition to traditional elements of a negligence action, that the accountant knew: 1)

the purpose for which the financial reports were to be used; and 2) the identity of the party intending to rely on the reports in furthering that purpose. The court also required conduct by the accountant linking the accountant to the plaintiff.

The Kansas legislature codified similar requirements in Kan.Stat.Ann. § 1–402 (1987). An action for negligent accounting services is prohibited unless the accountant: 1) knew that the reports produced by the accountant would be made available to the plaintiff (who was identified in writing); and 2) knew that the plaintiff

intended to rely on Ernst's audit work and comfort letter to proceed under a negligence theory. TBG has presented evidence that Ernst knew that TBG would use the comfort letter in deciding to acquire CHSI.

In addition, TBG must still show reliance to establish that the alleged negligence was the proximate cause of TBG's alleged damages. *Comeau v. Rupp,* 810 F.Supp. 1127, 1143 (D.Kan.1992). Thus, TBG may not escape the element of reliance under a claim for simple negligence. Moreover, TBG will not be permitted to recover under both theories for the same acts by defendants. As we pointed out earlier, TBG's negligence claim is really subsumed by its claim for negligent misrepresentation. Although the court has difficulty in discerning a distinction of significance between TBG's claim for negligence and its claim for negligent misrepresentation, out of an abundance of caution, Ernst's motion for summary judgment on TBG's negligence claim will be denied at this time.

### D. Bendis and Schreier's Stock Purchase Agreements

■ Schreier seeks summary judgment on TBG's claim for breach of contract claiming that TBG cannot show justifiable reliance, a required element for recovery for breach of an express warranty.[17] Even if we assume that Schreier is correct that New York law governs and that TBG must show justifiable reliance to recover on a claim for breach of warranty, summary judgment must still be denied. We cannot say as a matter of law that TBG's reliance was not justifiable because, as we have already discussed, genuine questions of material fact remain about TBG's knowledge.

■ Bendis and Schreier next argue that paragraph 9 of the stock purchase agreement limits their liability to the purchase price of the stock they sold. Paragraph 9 provides, in pertinent part:

> *Indemnification.* ... the Purchaser and the Seller agree that each shall indemnify the other and hold the other harmless from, any loss, liability, claim, damage or expense ... as incurred, for or on account of or relating from or in connection with or otherwise with respect to any breach or inaccuracy of any representation, warranty, agreement or covenant of the ... Purchaser or the Seller, ... contained in this Agreement or any document or any certificate furnished pursuant to or in connection with this Agreement, *provided, however,* that the liability of the Seller hereunder shall be limited to the Per Share Price paid or earned multiplied by the number of shares.

Bendis sold 303,900 shares at $6.00 per share and Schreier sold 112,308 shares at $7.16 to TBG pursuant to their respective stock purchase agreement. Thus, Bendis and Schreier argue that their liability is limited to $1,823,400 and $804,125, respectively.

TBG counters that it is not bound by the limitations on damages of paragraph 9 because Bendis and Schreier induced TBG's agreement by fraud. Notably, TBG does not seek rescission on the basis of fraud.[18] Rather, TBG asserts what it refers to as the "fraudulent inducement exception to contractual limitations on damages." In short, TBG argues that Bendis and Schreier may not enforce the limitation on damages of paragraph 9 because they procured the limitation through fraud. Although the law on this question is less than clear, on the facts of this case, we must ultimately agree.

---

intended to rely on those reports in connection with specified transactions (also described in writing). *Id.*

17. Paragraph 5(b) of the stock purchase agreements contained the following express warranty: The Seller hereby represents to the Parent and the Purchaser that the representations and warranties of the Company set forth in Section 3.1 of the Merger Agreement are true and correct and will be true and correct on and as of the Closing Date as if made on or as of the Closing Date; *provided, however,* that notwith-

standing the foregoing, nothing herein shall be deemed to be a guarantee of collectability of accounts receivable or Work in Progress....

18. TBG does not allege fraud as to the legal effect of the stock purchase agreements; accordingly, the agreements are not void. *Albers v. Nelson,* 248 Kan. 575, 809 P.2d 1194, 1198 (1991) ("Fraudulent misrepresentation as to the legal effect of an instrument will void a contract.")

Bendis and Schreier contend that TBG's election to sue on the contract is an affirmance of the contract by TBG. Accordingly, they argue, TBG is bound by the provisions of the contract, including paragraphs 8 and 9. *See Soviero Bros. Contracting Corp. v. New York,* 286 A.D. 435, 142 N.Y.S.2d 508, 513–14 (1955) (a party may not reap the benefits of the contract and thereafter elect to sue for damages in a fraud action beyond the limitations period of the contract); *Merryman v. Gottlieb,* 99 A.D.2d 893, 472 N.Y.S.2d 488, 490 (1984) (denying partial recision).

TBG asserts that the law will not permit a party to contractually exempt itself from liability by fraudulently inducing a limitation on liability in the contract. In support, TBG cites *Edwards v. North American Van Lines,* 129 A.D.2d 869, 513 N.Y.S.2d 895, 871 (1987), and *American Electric Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435, 460 (S.D.N.Y.1976). In *Edwards,* the court stated, "contractual limitations on remedies are generally enforced unless entered into under circumstances evidencing fraud" and held that the plaintiffs were bound by the contractual arbitration clause because they "failed to make a prima facie showing of fraud."

In *American Electric Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435, 460 (S.D.N.Y.1976), the court stated, "defendant cannot be heard to rely on the provisions of a contract which was entered into as a result of fraudulent actions on defendant's part." The court held that the provision precluding recovery of consequential damages would be ineffective if the plaintiffs' claims for fraudulent inducement were sustained at trial. *Id.* With very little discussion, the *American Electric* court cited only the section 2–721 of the Uniform Commercial Code and 6A *Corbin on Contracts* § 1472 (1962) at 606 in holding that the plaintiff could recover consequential damages for fraud despite the contractual provisions limiting recovery for breach of contract, tort, or breach of warranty claims to the cost of the price of the equipment sold. Notably, the Uniform Com-

mercial Code does not apply here because the instant case did not involve the sale of goods. U.C.C. § 2–102. Accordingly, U.C.C. § 2–721,[19] permitting recovery of consequential damages for fraud in *American Electric,* is not applicable to this case.

However, the court in *Soviero Bros.,* 142 N.Y.S.2d at 514, enforcing a contractual statute of limitations in a case against New York City held, "[i]f one elects to continue with [the contract], one accepts all the burdens contained in the contract as well as the benefits." The *Soviero Bros.* court distinguished "total immunity" clauses (designed to shield fraud) from limiting provisions (designed to place bargained-for limits on liability), characterizing the first as "bad" and the second as permissible if reasonable. *Id.,* 142 N.Y.S.2d at 513. *Soviero* is of limited guidance because the provision at issue here is a hybrid of those considered there—Bendis and Schreier seek to shield a portion of their liability through an allegedly fraudulently induced limitation on damages.

In *Corral v. Rollins Protective Servs.,* 240 Kan. 678, 732 P.2d 1260, 1263–65 (1987), the Kansas Supreme Court considered a provision limiting damages and stated that, generally, parties may contractually fashion their own remedies. However, the court also stated that a party cannot be bound by a contract obtained by fraud. *Id.* at 1263.

■ Taken together, these cases and general public policy considerations against encouraging fraudulent inducement of contracts lead us to the conclusion that Bendis and Schreier may not avail themselves of the damage limitations in the agreements if TBG prevails at trial on its claims for fraud or misrepresentation. At a minimum, genuine issues of fact about whether TBG was fraudulently induced to enter into the stock purchase agreements preclude summary judgment on defendants' motions seeking to limit TBG's remedy pursuant to paragraph 9 of the stock purchase agreements.

---

19. "Remedies for material misrepresentation or fraud include all remedies available under this Article for non-fraudulent breach. Neither rescission or a claim for rescission or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy." U.C.C. § 2–721.

■ Next, Bendis and Schreier argue that TBG's claims for breach of contract and indemnity are barred because TBG failed to notify them of the claims within the "survival period" contained in paragraph 8 of their respective stock purchase agreements. Paragraph 8 of the stock purchase agreements stated (with emphasis):

> The representations, warranties, agreements and covenants herein ... and in documents and certificates furnished pursuant to or in connection with this Agreement shall survive the Closing for the period commencing with the Closing and ending two weeks after delivery to the Company by the Parent's independent accountants of the *audited financial statements* of the Company setting forth the results of operations of the Company for the period ending November 30, 1987 or, in the case of any of the foregoing relating to taxes or tax returns, until the termination of applicable statute of limitations ... *provided, however,* that if within such period one party hereto shall have asserted a claim relating to any such representation, warranty, agreement or covenant by notice to the other party, then such representation, warranty, guaranty, or covenant, to the extent it relates to such claim shall survive beyond the expiration period.

Defendants contend: 1) that TBG received what amounted to audited financial statements for the period ending November 30, 1987, and 2) if TBG did not receive audited financial statements, TBG's own conduct rendered performance impossible. Accordingly, defendants argue that TBG may not now avoid the limitations period of the contract. In response, TBG submits that no audit of CHSI for the period ending November 30, 1987, was conducted, no audited financial statements were received by TBG or CHSI and that TBG did not render performance impossible.

The court finds that TBG has raised genuine issues of material fact about whether audited financial statements were ever generated or received by CHSI or TBG and whether TBG's own conduct rendered performance impossible. Accordingly, defendants' summary judgment motions based on paragraph 8 will be denied.

### E. TBG's Negligent Misrepresentation Claim Against Bendis

■ Relying primarily on *Kelley Metal Trading Co. v. Al–Jon/United, Inc.*, 812 F.Supp. 185 (D.Kan.1993), Bendis seeks summary judgment on TBG's negligent misrepresentation claim, arguing that Kansas law prohibits recovery of purely economic loss for negligence. TBG contends that a different rule, permitting recovery of economic damages for negligent misrepresentation, applies in the instant case because it involves the sale of stock, and not a defective product.

Judges in this district have recognized a cause of action for negligent misrepresentation under Kansas law. *See, e.g., Hippen v. First Nat'l Bank*, No. CIV.A.90–2024–L, 1992 WL 73554 (D.Kan. March 19, 1992) (listing the elements of negligent misrepresentation); *Golf Course Superintendents Ass'n v. Underwriters*, 761 F.Supp. 1485, 1490 (D.Kan.1991) (insurance policy dispute) ("A cause of action exists [in Kansas] for negligent misrepresentation."); *LNS Inv. Co. v. Phillips 66 Co.*, No. CIV.A.87–2215–0, 1989 WL 103637, at *5 (D.Kan. August 29, 1989) (alleged failure to disclose other suppliers of packaging; defendant cannot be liable absent a duty to disclose under the Restatement (Second) of Torts § 551(2) (1977); proper measure of damages is out-of-pocket loss).

In recognizing a cause of action under Kansas law for negligent misrepresentation in *LNS*, we looked to the Restatement (Second) of Torts §§ 551, 552, and 552B [20] (1977), *EF Hutton & Co. v. Heim*, 236 Kan. 603, 694 P.2d 445, 452–54 (1985), and *Johnson v. Geer Real Estate Co.*, 239 Kan. 324, 720 P.2d 660,

---

**20.** The Restatement (Second) of Torts § 552B provides, in part, "[t]he damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause." The measure of recoverable damages includes: 1) the difference between the true value when purchased and the purchase price; and 2) pecuniary loss suffered as a consequence of the plaintiff's reliance upon the misrepresentation. *Id.* Plaintiff is not entitled to recover damages for lost benefit of the bargain. *Id.*

665 (1986) (real estate broker's negligent failure to disclose).

Cases denying recovery of economic damages for negligence have considered the issue in light of contract law principles. *Green Constr. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir.1993) (citing the Restatement (Second) of Contracts § 164 (1981)), in limiting recovery for "innocent" misrepresentation to equitable relief, such as recision of the construction contract; *Diatom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1582 (10th Cir.1984) (plaintiff limited to breach of warranty theory for qualitative defects in product); *Kelley Metal Trading Co.*, 812 F.Supp. at 188 (negligent misrepresentations involving a furnace); *Nature's Share, Inc. v. Kutter Prods, Inc.*, 752 F.Supp. 371, 374 (D.Kan.1990) (economic damages denied on negligence claim involving qualitative defects in bird feeders purchased from the defendant); *Owens–Corning Fiberglas v. Sonic Dev. Corp.*, 546 F.Supp. 533, 541–42 (D.Kan.1982) (economic damages denied on claim of negligent manufacture, design, and installation of air compressors); *Bruce–O'Dell Concrete Prods., Inc. v. Mel Jarvis Constr. Co.*, 6 Kan.App.2d 757, 634 P.2d 1142, 1143, 1144 (1981) (liability and damages for simple economic loss caused by defectively constructed grain storage cylinders are governed by contract principles, rather than tort principles).

We do not believe that the Kansas · Supreme Court would deny recovery of economic damages on TBG's negligent misrepresentation claim under the facts of the instant case. Guided by the court's opinion in *EF Hutton & Co. v. Heim*, 236 Kan. 603, 611–16, 694 P.2d 445, 452–54 (1985), we believe that the court would permit recovery of purely economic damages for negligent misrepresentations made in connection with the sale of stock. In *EF Hutton*, the Kansas Supreme Court answered the following question: "What is the proper measure of damages to be awarded for a commodity broker's negligent misrepresentation of the market price at which a trade was executed?" *Id.* at 613, 694 P.2d at 453. The court held,

> [i]n an action against a broker for negligently reporting a stock or commodity transaction and where there was no wrongful conduct on the part of the broker (other than negligence), the proper measure of damages is the same as in any negligence action which does not involve intentional or gross and wanton conduct.

*Id.* at 615–16, 694 P.2d at 454.

We believe TBG's claim for negligent misrepresentation presents a different issue than other types of negligence claims such as those alleging negligent design or manufacture of a product. The practical effect of extending the holding in *Kelley* to the instant case would be to exempt directors and officers from liability for negligent misrepresentations about the corporation made in connection with the sale of the corporation's stock, simply because the plaintiff sustained only economic loss. It is, indeed, difficult to envision damages other than those of a purely economic nature resulting from such a transaction. The requirement that a plaintiff must show physical injury or property damage to recover accompanying economic loss,[21] is inapplicable to the instant case.

Accordingly, TBG's negligent misrepresentation claim for economic damages will be permitted. Bendis's motion for summary judgment on TBG's negligent misrepresentation claim will be denied. However, because TBG's claim accrued prior to the 1987 amendment to Kan.Stat.Ann. § 60–258a (applying comparative fault to negligence claims for purely economic loss), contributory negligence will bar recovery. *See Monarch Normandy Square Partners v. Normandy Square Assocs. Ltd. Partnership*, 817 F.Supp. 908, 919 (D.Kan. March 16, 1993) (applying contributory negligence to claim for negligent misrepresentation accruing prior to 1987 amendment to Kan.Stat.Ann. § 60–258a).

---

21. In *Diatom*, 741 F.2d at 1580–82, the Tenth Circuit discussed recovery of purely economic loss without accompanying physical injury or property damage and held that the only available remedy in such a case was under breach of warranty.

## F. Bridgmon's Cross–Claims Against Bendis and Schreier

Bendis and Schreier contend that Bridgmon fails to state a claim for contribution in the pretrial order simply by alleging that if he (Bridgmon) is found liable for misrepresentations to anyone else, Bendis and Schreier are liable to him based on their primary fault. Reading the pretrial order as a whole, the court finds that Bridgmon should be permitted to amend his cross-claim to set forth the legal basis for his contribution claim, i.e., Kansas, New York, or federal securities law. Further, we find that allowing Bridgmon to amend will not unduly prejudice Bendis or Schreier. Accordingly, in the interests of justice, Bridgmon will be permitted to amend the pretrial order to more fully set forth his contribution claim.

■ Bendis and Schreier also argue that the release executed by Bridgmon and TBG/CHSI, as a part of the settlement of Bridgmon's earlier lawsuit in state court, released Bendis and Schreier from Bridgmon's claim for contribution in this case. In the Settlement, Release, and Indemnity Agreement, Bridgmon agreed to:

> release ... TBG and CHSI, their predecessors, whether partnership or corporation, affiliates, subsidiaries, partners, shareholders, successors, representative and assigns and past and present agents, officers, directors and employees from any and all liabilities, actions, claims, cross-claims, demands, suits, or appeals, known or unknown, accrued or to accrue, liquidated or otherwise, legal or equitable, whether statutory or based in common law, of whatsoever kind or nature, including any claim for attorneys' fees, or for contribution, indemnity ...

Bridgmon's intent in executing the release is critical. In *Kennedy v. City of Sawyer*, 228 Kan. 439, 453–54, 618 P.2d 788, 799 (1980), the court examined the parties' intent as evidenced by the plain language of two different releases. Bendis and Schreier argue that, under the plain language of the release, Bridgmon released all future claims against them for contribution, even in this independent suit. Notably, the release does not expressly refer to Bendis or Schreier.

Rather, Bendis and Schreier argue, the release applied to them, as past and present officers and directors of CHSI, and released all future cross-claims by Bridgmon against them.

We cannot agree that, as a matter of law, the language of the release establishes an intent to release Bendis and Schreier from Bridgmon's cross-claims for contribution in this separate case. In short, genuine questions of fact about Bridgmon's intent and the proper interpretation of the contract preclude summary judgment. In light of our refusal to grant summary judgment, we need not reach Bridgmon's estoppel argument at this time.

## G. Masinton's Claim for Contribution Against Bendis

Bendis also argues that Masinton failed to state a claim for contribution in the pretrial order simply by alleging that if he is found liable for misrepresentations to anyone else, Bendis is liable to him. Reading the pretrial order as a whole, the court finds that Masinton should be permitted to amend the pretrial order to more fully set forth the bases for his contribution claim, i.e., whether the claim is brought under Kansas, New York, or federal securities law. We find that allowing Masinton to amend the pretrial order will not unduly prejudice Bendis. Accordingly, in the interests of justice, Masinton will be granted leave to amend the pretrial order to more fully set forth his claim for contribution.

## H. Billington's Claims Against Bendis and Schreier

■ Bendis and Schreier filed third-party claims against Billington for: 1) contribution; 2) comparative fault under Kan.Stat.Ann. § 60–258a; and 3) indemnification. Billington has filed motions for summary judgment on several grounds.

First, Billington contends that he is entitled to summary judgment on all claims because Bendis and Schreier did not rely on Billington. Billington maintains that such reliance is required to establish joint responsibility, an essential element of Bendis and Schreier's contribution claims. *See Musick,*

**1570**

*Peeler & Garrett,* — U.S. —, —, 113 S.Ct. 2085, 2091, 124 L.Ed.2d 194 (1993) ("Those charged with liability in a 10b–5 action have a right of contribution against other parties who have *joint responsibility* for the violation.").

Bendis, on behalf of CHSI, wrote Billington a letter dated July 17, 1993, which stated, "You [Billington] were never made fully aware of the financial affairs and transactions of the Company [CHSI] and cannot be held responsible for any misstatement, error or omission in those [CHSI's] financial statements and projections or in the related disclosure, whether oral or written." Billington also attended the meeting with Masinton on May 30, 1986, to voice concerns to Bendis and Schreier about the accuracy of representations made to TBG as a part of the acquisition.

Billington contends that the letter and Billington's timely disclosure of potential errors in the documents provided to TBG defeat assertions by Bendis and Schreier that they relied on Billington's alleged representations in the documents and, therefore, preclude their claims for contribution and indemnity. Billington maintains that he cannot be held jointly responsible for any damages that TBG may be found to have incurred as a result of section 10(b) violations by Bendis and Schreier because Bendis and Schreier could have avoided the violation by disclosing the concerns raised by Billington and Masinton in the May 30, 1986, meeting.

Bendis and Schreier argue that whether they relied on Billington is irrelevant because reliance by a joint tortfeasor is not an essential element of a claim for contribution. Rather, they suggest, the focus should be on whether Billington is jointly responsible to TBG for the alleged injury. If so, Bendis and Schreier contend, they, as the joint tortfeasors required to compensate TBG, have a right to recover contribution from Billington. We need not decide this question because, even if Billington is correct that joint responsibility requires reliance, factual issues about reliance would preclude summary judgment. The court cannot determine, as a matter of law, that the July 17, 1993, letter released Billington from joint responsibility to TBG or

from contribution liability to Bendis and Schreier. In addition, genuine issues of fact remain about the breadth of the concerns voiced by Masinton and Billington in the May 30, 1986, meeting with Bendis and Schreier. Accordingly, Billington's motion for summary judgment based on lack of reliance by Bendis and Schreier will be denied.

■ Second, Billington argues that there is no right of contribution under federal securities law. Billington's argument fails in light of the Supreme Court's recent holding that an implied right to contribution is available in 10b–5 actions. *Musick,* — U.S. at —, 113 S.Ct. at 2089–92.

■ *Musick* did not address the question of whether the Supreme Court's ruling may be extended to actions under section 20(a). Billington urges that *Musick* supports the conclusion that contribution is not available in a section 20 action because the Supreme Court expressly contrasted the nature of actions under section 10(b) with those under section 20 in holding that an implied right of contribution is available under section 10(b). *Musick,* at — – —, 113 S.Ct. at 2090–91. We agree. Although the Court's opinion in *Musick* evidences a willingness to imply a right to contribution in federal securities laws, in light of the distinctions drawn by the Court in its holding in *Musick* between section 10(b) and section 20, we decline to extend an implied right of contribution to section 20 claims. *First Golden Bancorporation v. Weiszmann,* 942 F.2d 726, 732 (10th Cir. 1991), cited by Schreier, does not convince us that the Tenth Circuit would rule otherwise. Accordingly, Billington's motion for summary judgment will be granted as it relates to claims for contribution by Bendis and Schreier for liability under section 20.

Third, Billington maintains that the Kansas Comparative Fault Statute, Kan.Stat. Ann. § 60–258a, does not apply in the instant case because Bendis and Schreier seek purely economic damages for acts occurring before the statute was amended in 1987 to expressly include negligence actions seeking economic damages. The Kansas Supreme Court in *Wichita Fed. Sav. & Loan Ass'n v. Black,* 245 Kan. 523, 542, 781 P.2d 707, 719

(1989), held that, prior to the 1987 amendment, Kan.Stat.Ann. § 60–258a did not apply to actions for economic loss. The court refused to apply Kan.Stat.Ann. § 60–258a retroactively. *Id.* at 544, 781 P.2d at 720–21.

In accord, Judge Theis of this court cited *Black* in holding that the 1987 amendment to section 60–258a is not to be applied to claims for economic loss which accrued prior to July 1, 1987. *Comeau v. Rupp,* 762 F.Supp. 1434, 1438 (D.Kan.1991). Notably, Bendis and Schreier do not counter Billington's arguments on this issue. Kan.Stat.Ann. § 60–258a (as amended effective July 1, 1987) is not applicable to Bendis's and Schreier's pre-1987 negligence claims for purely economic damages. The allocation of fault as between third-party plaintiffs Bendis and Schreier and third-party defendant Billington is governed by the law of contribution and indemnity as it existed in Kansas prior to the adoption of Kan.Stat.Ann. § 60–258a. *See Comeau v. Rupp,* 762 F.Supp. at 1438. Billington's motions for summary judgment on the claims of Bendis and Schreier for comparative fault will be granted.

Fourth, Billington suggests summary judgment should be granted on the pendent state law claims of Bendis and Schreier for fraud and negligent misrepresentation because Kansas law did not recognize a right to contribution among joint tortfeasors at the time the claims accrued. Prior to the adoption of comparative fault, Kansas adhered to " 'the common law rule that there is no right to contribution between joint tortfeasors.' " *Comeau v. Rupp,* 762 F.Supp. at 1439 (quoting *Alseike v. Miller,* 196 Kan. 547, 550, 412 P.2d 1007 (1966)). However, under Kan.Stat.Ann. § 60–2413(b), joint judgment debtors could maintain an action for contribution. *Comeau,* 762 F.Supp. at 1438–39; *see also Brown v. Keill,* 224 Kan. 195, 580 P.2d 867 (1978) (the right to contribution among joint judgment debtors not necessary under comparative fault). Accordingly, to the extent that Bendis and Schreier seek contribution for liability on Kansas state law claims for

fraud and negligent misrepresentation, Billington's motion will be granted.

Finally, Billington argues that Bendis and Schreier fail to state actionable claims for implied, non-contractual indemnity against him. In *Kennedy v. City of Sawyer,* 228 Kan. 439, 454–62, 618 P.2d 788, 797–804 (1980), the court discussed traditional indemnity principles in Kansas and adopted a form of compared implied indemnity between joint tortfeasors. Under Kansas law, implied indemnity arises in two instances:

> 1) where one personally without fault is made to pay for the tortious acts of another, such as in the case of the liability of a principal for the acts of the agent, or 2) where the negligence of the indemnitee can be characterized as 'passive' or 'secondary,' as contrasted to the 'active' or 'primary' negligence of the indemnitor.

*Comeau v. Rupp,* 762 F.Supp. at 1438 (citing *Kennedy,* 228 Kan. at 455, 618 P.2d 788). Bendis and Schreier apparently seek the second type implied indemnity for Billington's "active" or "primary" negligence as it related to TBG's claim against them in Count II[22] for breach of the stock purchase agreements.

The active/passive dichotomy was discussed in *Russell v. Community Hosp. Ass'n,* 199 Kan. 251, 257, 428 P.2d 783, 788 (1967). Under Kansas law, indemnification is allowed if the tortfeasors are "not *in pari delicto,* and their negligence is substantially different not merely in degree but in character, it is generally recognized that indemnity may be awarded." *Id.* (quoting *Security Ins. Co. of New Haven v. Johnson,* 276 F.2d 182, 185 (10th Cir.1960)).

Bendis and Schreier argue that because TBG's allegations involve accounting violations in financial statements prepared, at least in part, by Billington, there are factual questions about the degree and character of their negligence as compared to that of Billington. Billington relies on the July 17, 1986, letter to establish that he is without "primary" or "active" fault.

---

**22.** Count II of TBG's complaint alleges that Bendis and Schreier breached their respective stock purchase agreements by falsely representing that the representations set forth in paragraph 3.1 of the Merger Agreement were true and correct when, in fact, they contained serious accounting violations.

Based on the record before the court, we question whether indemnification of Bendis and Schreier by Billington may be "rationally justified upon equitable considerations." *Security Ins. Co. of New Haven v. Johnson,* 276 F.2d 182, 185 (10th Cir.1960). However, genuine issues of fact about what allegedly inaccurate financial information is relevant to TBG's claim for breach of contract and Billington's role in preparing that information preclude summary judgment at this juncture. We cannot determine, as a matter of law, whether Billington was *in pari delicto* with Bendis and Schreier, or whether Billington's negligence was substantially different in character from that of Bendis and Schreier.

## III. The Choice of Law Issue

Although various sections of the parties' briefs refer to choice of law questions, the parties have not squarely addressed the issues. While all the arguments may be there, they are not presented in a clear and concise fashion. The court has declined to decide what law governs the various pendent state law claims due to the piece-meal nature of the briefs on the choice of law issues in the record presently before the court. The parties are hereby directed to file any briefs they deem necessary to concisely present their positions on the choice of law issues by January 10, 1994. Responses are due by January 24, 1994, and replies are due by January 31, 1994.

## IV. Motions for Reconsideration

Because of the voluminous filings already made with regard to the present motions, any motions for reconsideration of this order shall be limited to 20 pages. Responses and replies shall be limited to 15 and 10 pages, respectively. All page limits include attachments and appendices.

## V. Conclusion

IT IS THEREFORE ORDERED that Ernst and Whinney's motions for summary judgment on the issues of reliance (Doc. # 866), causation (Doc. # 864), and on Count VII (Doc. # 862) are denied.

IT IS FURTHER ORDERED that Bendis's motion for summary judgment (Doc. # 877) is denied.

IT IS FURTHER ORDERED that Schreier's motions for summary judgment on Counts I, II, V, X, and XI (Doc. # 887) and on Bridgmon's cross-claim (Doc. # 889) are denied.

IT IS FURTHER ORDERED that Billington's motion for summary judgment (Doc. # 874) is denied in part and granted in part.

IT IS FURTHER ORDERED that the parties shall submit briefs on the choice of law question in accordance with the schedule set forth herein.